23 CV 6567-L

# PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District: WESTERN DISTRICT OF NEW YORK |
|---|---|

| Name: LaSHAWN LEWIS | Prisoner No. 18G1036 | Case No. |
|---|---|---|

Place of Confinement: BEDFORD HILLS CORRECTIONAL FACILITY

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| LaSHAWN LEWIS V. | EILEEN RUSSELL |

The Attorney General of the State of:

## PETITION

1. Name and location of court which entered the judgment of conviction under attack ERIE COUNTY SUPREME COURT BLDG - 25 DELAWARE AVENUE - BUFFALO, NY. 14205

2. Date of judgment of conviction SEPTEMBER 19, 2018

3. Length of sentence 25 YEARS TO LIFE

4. Nature of offense involved (all counts) SECOND DEGREE MURDER 125.25 (1)

5. What was your plea? (Check one)

   (a) Not guilty [✓]

   (b) Guilty [ ]

   (c) Nolo contendere [ ]

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: N/A

6. If you pleaded not guilty, what kind of trial did you have? (Check one)

   (a) Jury x 2 [✓]

   (b) Judge only [ ]

7. Did you testify at the trial?

   Yes [ ]   No [✓]

8. Did you appeal from the judgment of conviction?

   Yes [✓]   No [ ]

UNITED STATES DISTRICT COURT
FILED
OCT 2 2023
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

9. If your answer to 8. was "yes," <u>attach a copy of the appeals court decision to this petition</u> and answer the following:

   (a) Name of court (e.g., NYS Sup. Court, 4th Dept.) _NYS. SUP. COURT, 4TH DEPT._

   (b) Result _AFFIRMED_

   (c) Date of result and citation, if known _NOV. 19, 2021 → 199 A.D. 3d 1441_

   (d) List <u>all</u> grounds you raised (1) _A TWELVE-YEAR DELAY IN PROSECUTION WAS_
   _UNACCEPTABLE WHERE THE PEOPLE FAILED TO CAREFULLY REVIEW THE FILE_
   (2) _A FRYE HEARING WAS WARRANTED WHERE DEFENSE COUNSEL ESTABLISHED_
   _A CONTROVERSEY OF THE USE OF PSEUDO-SCIENCE, UNRELIABLE "EXPERT" CONCLUSIONS_
   (3) _THE CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE WHERE_
   _SLIPSHOD POLICE WORK LEFT KEY QUESTIONS UNANSWERED_
   (4) _THE INDELIBLE RIGHT TO COUNSEL ATTACHED IN 2005 AND COULD NOT BE_
   _WAIVED IN 2017 BECAUSE OF THE PASSAGE OF TIME ENTIRELY ATTRIBUTABLE TO THE_
   _PROSECUTIONS INADVERTENCE_

   *SEE ATTACHED FOR ADDITIONAL GROUNDS*

10. Did you seek further review of the appeals court decision by a higher state court (e.g., the NYS Court of Appeals)?

    Yes [✓]   No [ ]

11. If your answer to 10. was "yes," <u>attach a copy of the higher state court decision to this petition</u> and answer the following:

    (a) Name of court _COURT OF APPEALS NEW YORK_

    (b) Result _LEAVE TO APPEAL DENIED_

    (c) Date of result and citation, if known _MAY 12, 2022 → 38 N.Y. 3d 1034_

    (d) List <u>all</u> grounds you raised (1) _same_
    _grounds_
    (2) _raised_
    _in_
    (3) _direct_
    _appeal_
    (4) _above w/_
    _EMPHASIS/DETAIL ON GROUND #2 → DENIAL OF FRYE HEARING_

12. Did you file a petition for certiorari in the United States Supreme Court?

    Yes [✓]   No [ ]

13. If your answer to 12. was "yes," <u>attach a copy of the United States Supreme Court decision to this petition</u> and please answer the following with respect to each direct appeal you asked the United States Supreme Court to review:

(5) IN A CASE THAT WAS WEAK TO BEGIN WITH, THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT WHEN HE BOOTSTRAPED IMPROPER EXPERT TESTIMONY, RELIED ON APPEALS TO SYMPATHY, AND OVERSTATED THE WEIGHT TO BE ACCORDED TO EVIDENCE

(6) THE MAXIMUM SENTENCE WAS HARSH AND EXCESSIVE AND THE COURT ERRED IN DENYING Ms. LEWIS THE OPPORTUNITY TO CONTEST A RANDOM "FRIEND" OF THE DECEDENT TO SPEAK ABOUT MEDIUMS AND PSYCHICS

(a) Result _DENIED_

(b) Date of result and citation, if known _OCT. 3, 2022 → 143 S. CT. 262 (MEM)_

(c) List all grounds you raised (1) _WAS PETITIONER DEPRIVED OF DUE PROCESS WHERE THE COURT DENIED HER ANY MEANINGFUL OPPORTUNITY TO CONTEST THE USE OF JUNK SCIENCE AT HER TRIAL?_

_(2) IS NEW YORK'S RELIANCE ON THE ANTIQUATED FRYE STANDARD ANACHRONISTIC TO THE DEMANDS OF DUE PROCESS AND INCONSISTENT WITH THIS COURT'S HOLDING IN DAUBERT, ESPECIALLY WHERE THIRTY-THREE STATES AFFORD DEFENDANTS GREATER PROTECTIONS?_

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g. a petition under NY CPL § 440, a state habeas petition, or a previous petition under 28 U.S.C. 2254) with respect to this judgment in any court, state or federal?

Yes ☐   No ☑

15. If your answer to 14. was "yes," attach a copy of that court's decision to this petition and give the following information:

(a) Name of court _____ _N/A_ _____

(b) Nature of proceeding _____

(c) Date Filed _____

(d) List all grounds you raised (1) _____

(2) _____

(3) _____ _N/A_ _____

(4) _____

(e) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes ☐   No ☐   _N/A_

(f) Result _____ N/A _____

(g) Date of result _____

16. If your answer to 14. was "yes" and you also filed a second petition, application, or motion, attach a copy of that court's decision to this petition and give the same information:

(a) Name of court _____ N/A _____

(b) Nature of proceeding _____

(c) Date Filed _____

(d) List all grounds you raised (1) _____

_____

(2) _____

(3) _____

(4) _____ N/A _____

(e) Did you receive an evidentiary hearing on your petition, application, or motion?

      Yes ☐    No ☐

(f) Result _____ N/A _____

(g) Date of result _____

As to any third, fourth, etc. petition, application, or motion, attach a copy of that court's decision to this petition and give the same information asked for under 15. and 16.

17. If your answer to 14. was "yes" and if the court did not grant the petition(s), application(s), or motion(s) you listed under 15. and 16., did you appeal to an intermediate court of appeals (e.g., the New York State Court of Appeals or the Second Circuit Court of Appeals)?

Yes ☐    No ☐    N/A

18. If your answer to 17. was "yes," attach a copy of the appeals court decision to this petition and answer the following regarding each petition, application, or motion:

(a) Name of court _____ N/A _____

(b) Date Filed _____

(c) Result _____

(d) Date of result and citation, if known _____ N/A _____

(e) List __all__ grounds you raised (1) _____ N/A _____

(2) _____

(3) _____

(4) _____

N/A

19.    Did you appeal to the highest state court (e.g., the NYS Court of Appeals) or the United States Supreme Court for review of decisions regarding the petition(s), application(s), or motion(s) you listed in 15. and 16.?

(a) First petition        Yes [ ]        No [ ]

(b) Second petition       Yes [ ]        No [ ]        N/A

(c) Third petition        Yes [ ]        No [ ]

[List any other petition and indicate yes or no.]

20.    For __each__ "yes" answer in 19., __attach a copy of that court's decision to this petition__ and give the following information:

(a) Name of court _____ N/A _____

(b) Date filed _____

(c) Result _____

(d) Date of result and citation, if known _____

(e) List __all__ grounds you raised (1) _____

(2) _____

(3) _____

(4) _____

N/A

21.    If you did *not* appeal from the adverse action on any petition, application, or motion, explain briefly why you did not:

_____ N/A _____

_____

_____

22.   State *concisely* every ground on which you claim that you are being held unlawfully. Summarize briefly the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

      CAUTION: In order to proceed in federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. *See* 28 U.S.C. §2254(b). If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date. *See* 28 U.S.C. §2244(b).

      For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

      Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)   Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b)   Conviction obtained by use of coerced confession.
(c)   Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d)   Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e)   Conviction obtained by a violation of the privilege against self-incrimination.
(f)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g)   Conviction obtained by a violation of the protection against double jeopardy.
(h)   Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i)   Denial of effective assistance of counsel.
(j)   Denial of right of appeal.

A.    Ground one: Violation of Due Process Clauses of the Fifth and Fourteenth Amendment. Due to 12-year preindictment delay

Supporting FACTS (state briefly without citing cases or law): Crime occurred August 2005; Defendant was not arrested by indictment until November 2017; By December 2005, the prosecutorial team had all the evidence used in both trials in 2018; No new evidence surfaced during the 12-year delay; reason for the delay was due to miscommunication about a statement that multiple detectives noted, repeatedly over the 12-year period, thereby making it impossible for the defendant to present a defense, along with a number of other reasons that are detailed in attached supporting facts; DELAY WAS UNJUSTIFIABLE; NEGLIGENCE CANNOT BE IGNORED.

B. Ground two: Violation of Petitioner's Indelible Right to Counsel U.S.C.A 6, 14

Supporting FACTS (state briefly without citing cases or law): Counsel attached in 2005 when he called the police and hand delivered a letter; the case was not prosecuted until 12 years later, where the passage of time does not negate attachment of counsel; nor does beliefs about conflicts sever the attorney-client relationship; it was improper for police to rely on assertions from the prosecutor or for them to contact counsel during an in camera meeting; either way counsel must be present to waive the relationship — making the statements and all evidence seized outside of counsel's presence a violation and not harmless.

C. Ground three: Violation of Petitioner's Due Process Right of Legally Sufficient Evidence U.S.C.A. 14

Supporting FACTS (state briefly without citing cases or law): The conviction was full of guess-work and speculation, where the evidence does not corroborate with the People's story; the case was wholly circumstantial and the evidence far from overwhelming; defendants DNA was not present where the crime occurred rather male DNA profiles were found and still unknown; the handle to the murder weapon is missing, yet defendant never left the scene; an unreliable witness alleged defendant confessed - there is no proof of this nor does this persons statement corroborate with the evidence.

D. Ground four: Deprived of Due Process Right to the Legal Standard of Admissibility of Novel Scientific Evidence - U.S.C.A 14

Supporting FACTS (state briefly without citing cases or law): State Court denied defense counsel's request for a Frye hearing and allowed a retired Canadian policeman to testify as a "blood spatter expert", who only looked at photos and concluded the defendant must have committed the crime, based on a hunch; there was no measurements or scientific technique involved; the "expert" eventually admitted there is no way to reproduce blood spatter, nor did he have a clue about the error rate; had nothing to support conclusions; jury convicted on improper grounds.

23. If you did not previously present any of the grounds listed in 22A, 22B, 22C, and 22D in any other court, state or federal, state briefly what grounds you did not present and give your reasons for not presenting them:

ALL ABOVE GROUNDS WERE SUBMITTED FOR APPEAL

24. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ☐    No ☑

(a) Name of court _____ N/A _____

(b) Nature of proceeding _____

(c) Date filed _____

(d) List all grounds you raised (1) _____

(2) _____

(3) _____

(4) _____ N/A _____

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you challenge in this petition:

(a) At preliminary hearing _____ unknown _____

(b) At arraignment and plea ___ GREGORY A. FINA, → address unknown

(c) At trial ① KEVIN SPITLER, ESQ.    ② MICHAEL KOOSHOIAN, ESQ.
181 FRANKLIN ST. / SUITE 300    168 ROBINSON STREET
BUFFALO NY 14202    TONAWANDA, NY 14120

(d) At sentencing ① KEVIN SPITLER, ESQ. ② Michael KOOSHOIAN, ESQ.
181 FRANKLIN ST. / SUITE 300    168 ROBINSON STREET
BUFFALO, NY 14002    TONAWANDA, NY 14120

(e) On appeal ERIN KULESUS ESQ. Legal Aid Society
290 MAIN ST. / SUITE 350 - BFLO, NY 14202

(f) In any post-conviction proceeding ERIN KULESUS - Legal Aid Society
✱ COURT OF APPEALS ✱    290 MAIN ST. / SUITE 350 - BUFFALO NY 14202

(g) On appeal from any adverse ruling in a post-conviction proceeding Erin Kulesus ESQ. Legal Aid Society
✱ WRIT OF CERTIORARI ✱    290 Main St / Suite 350 · Buffalo, NY 14202

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes ☐    No ☑

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐    No ☑

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____N/A_____

(b) Give date and length of the above sentence: _____N/A_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐    No ☑

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

____9 / 25 / 23____
(Date)

_____
Signature of Petitioner

## SUPPORTING FACTS

**Ground One:** Violation of Due Process Clauses of the Fifth and Fourteenth Constitutional Amendments due to 12-year pre-indictment delay.

Petitioner was denied her right to due process and prompt prosecution by the over twelve-year delay between August 4, 2005, the date of the crime, and November 2017, when she was arrested and charged by indictment.

On August 4, 2005, the petitioner was questioned by the Buffalo Police Department after finding the victim (her mother) brutally murdered at home, in a bloody bedroom, with pieces of a knife broken in her. Petitioner was never detained or officially in police custody in 2005, rather she was released after giving her statement. Within two weeks of the murder, the District Attorney's office consulted a retired Canadian policeman, who deemed, after viewing photos, that the Petitioner had to have committed the crime. Four months later, on December 13, 2005, a predicate offender gave a statement to a Buffalo Police detective, alleging that the petitioner confessed to committing the crime. The prosecution team had all the information in 2005 used to prosecute the case, yet the petitioner was not indicted and arrested until November 2017.

No additional evidence surfaced throughout the entire twelve-year period. The State court's denial to dismiss the indictment due to the lengthy pre-indictment delay was an unreasonable application of clearly established Federal Law to Due Process and prompt prosecution.

The Supreme Court in U.S. V. Santiago, 987 F.Supp 2d 465, held that due process claims of prejudicial pre-indictment delay can "prevail upon showing that the Government delayed seeking an indictment in reckless disregard of its probable prejudicial impact upon the

1

defendant's ability to defend against the charges". The delay was detrimental to Petitioner's defense in that there was DNA evidence—too degraded 12 years later to be tested—that was not matched to the petitioner and could have exculpated her if it could have been tested (tr. at 941). The petitioner's father, a witness, started to suffer from dementia (tr. at 462). Any alibi evidence, such as receipts and video camera footage, was long gone, that would have proven the actual time Petitioner arrived at the scene. As the Second Circuit previously indicated, "to support a claim of prejudice, a defendant must make a particularized showing that ... the defendant is unable to reconstruct the events surrounding the alleged offense" (United States v. Feinburg, 383 F2d 60). A twelve year delay fully attributed to the prosecution meant that defense counsel had nowhere to investigate nor could they have canvassed the neighborhood.

In addition to the fading memories of witnesses (including Ramona Wallace- who gave the police the 2005 statement belatedly alleging the petitioner spontaneously confessed to her; a postman; and a neighbor), who had to be shown their initial 2005 statements to refresh their recollections, witnesses died, one of which may have been the contributor of the unknown male DNA found at the murder scene. To date, this male's identity remains unknown.

The prosecution bears the burden to show that there was good cause for the delay. The prosecution asserted reason for the delay is simply not an acceptable excuse or justification. They argue the delay was because the police, who are an "arm of the prosecution," did not tell the prosecutor about certain pieces of information, specifically the December 2005 statement from Ramona Wallace in which she alleges that the petitioner confessed to her, an acquaintance, in August, for twelve years. However, this document was not hidden—it was referenced at different spots in the file and at some point, became the first document in the case file. A purported file review "accident" that repeated for twelve years is not good cause. *See attached

2

<u>Addendum A at A 1, which specifically cites petitioner's *Singer* hearing testimony that validates many occasions that petitioner's due process rights were violated.</u> *

Due diligence was not exercised where the sole reason for the pre-indictment delay was attributable to the government. Negligence in miscommunication on the part of the government cannot be justified as a reason for delaying an indictment. In fact, in <u>Kyles v. Whitley</u>, 115 S.Ct. 1555, the Supreme Court of the United States determined the prosecution is responsible for being aware of the evidence against the petitioner, and "that responsibility remains regardless of any failure by the police to bring favorable evidence to the prosecutor's attention."

A defendant cannot be disadvantaged by the factionalism of the prosecutorial arm of the State. The prosecutor lacks good cause if he has all the information at his disposal necessary for prosecuting a case but fails to do so because he "missed" something in the file. "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide." <u>Doggett v United States</u>, 505 US 647, 657 [1992]

By December 13, 2005, the government had all the evidence it used to indict the petitioner twelve years later.

The record also shows at the second trial[1], Petitioner renewed her motion to dismiss for pre-indictment delay due to: actual prejudice; faded memories; evidence lost or destroyed; and the indictment being based on nothing more than was known in 2005, nor was it based on new technology. (See <u>U.S. v. Marchese</u>, 966 F.Supp. 2d 22) This is further evident due to petitioner's indictment number being 01978-2005, when in fact she was not arrested until 2017.

---

[1] Petitioner was tried twice in 2018. The first trial ended in a mistrial after the jury deadlocked.

As the Supreme Court further has explained, where delay prejudices the presentation of a defense, it violates the Due Process Clause because such conduct departs from the fundamental notions of "fair play" (United States v. Lovasco, 431 U.S. 783). There was nothing complex about this case; there was no extensive documentary review required; all of the witnesses were cooperative; there was no new technology that yielded a break; the petitioner's whereabouts were known for the entire twelve-year period. There was no legitimate reason for the delay.

The ignorance of the prosecutorial team was glaring: the trial judge stated, "It was not the finest hour for the police" (tr 11/8/18 at 8). This is a prime example of an occurrence that violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions." There is no doubt that the delay was unnecessary and inadequately explained, and the indictment should be dismissed. Furthermore, testimony by the lead District Attorney and detectives of the Buffalo Police Department acknowledged that "the police department made a mistake regarding the statement" (H.T. p. 174, 1. 10-24) and the "12-year delay could be detrimental to a defendant" (H.T. p.111, 1. 1-4). It was detrimental to the petitioner, and ultimately, the prosecution's delay strengthened the State's case.

It was sheer incompetence for several detectives and assistant district attorneys to miss a "critical" statement at the front of the file for twelve years. Incompetence does not operate as an excuse when a citizen faces a life sentence. For nearly a decade after 2005, nothing was done at all. Several detectives retired. ADAs came and left. The case file sat. The victim's fingernails were finally tested in 2014, nine years after the offense, but the petitioner's DNA was not found (tr at 492).

Then, in April 2016, a cold case detective met with a DA who had already reviewed the case in 2009. She brought renewed attention to Ramona Wallace's statement of the alleged

confession, and this is why the petitioner was indicted, based on this 12-year-old, known statement by a woman, known to the police to be so unreliable that she was not found credible in 2005.

Additionally adding to the prejudice, the petitioner suffered because of the pre-indictment delay, the People's own witness admitted one item used for DNA testing was so old and degraded that it had bugs in it and could not be tested (tr at 941). The People also acknowledged in summation that the still camera shot was grainy; too much time had passed so the petitioner could not view the actual video (tr at 1056). So much time had passed that the attorney who was retained to represent her on this matter in 2005 no longer believed he represented her, based on the passage of time alone, leaving the petitioner without counsel in 2017. These facts were before the Courts. Accordingly, defense counsel's request to dismiss the indictment should have been granted. The innumerable encounters of negligence mentioned above cannot be ignored when a citizen's liberty is at stake.


**Ground Two:** Violation of Petitioner's Indelible Right to Counsel Under USCA 6 and 14

Petitioner's indelible right to counsel attached in 2005 when her family retained a lawyer specifically for this matter (Tr 2/6/18 at 37). This right was not short-lived because the People failed to timely prosecute, nor did it fade with time, and the petitioner and her attorney never formally, or even informally, ended their attorney-client relationship. The evidence seized from petitioner following counsel's entry in 2005 should have been suppressed as she was asked to sign consent forms in her attorney's absence after her counsel told police not to speak with his client. Also, the statement and buccal swab obtained in 2017 should have been suppressed for the

same reason. Any waiver of counsel outside of counsel's presence cannot be deemed as knowing and voluntary.

The indelible right to counsel attaches when counsel is retained and enters the case. The passage of time between entry and prosecution is irrelevant. Entry means any attorney involvement in the case. Once the right attaches, law enforcement cannot ask the client for anything without defense counsel being present.

In this case, defense counsel became involved when he called the police department and hand-delivered a retention letter on the same day as the murder in 2005 (Tr 2/6/18 at 38-39). Once counsel sent the letter at 4 pm, and the police became aware, they were prohibited from asking the petitioner to sign a consent form regarding her clothing, but they did so anyway. The People's argument that the items could have been seized due to the inevitable discovery doctrine fails because the police had petitioner sign the document in contradiction of her retained counsel's instructions and also because the inevitable discovery doctrine does not apply to situations where the illegally seized evidence was the evidence sought to begin with.

The next issue is whether the right to counsel is waived. A right so critical can only be waived when defense counsel is present during the waiver and any waiver made without retained counsel's presence is not knowing or voluntary. Even if a defendant elects to speak to police following defense counsel's entry in a case, any waiver is invalid unless counsel is present for the alleged waiver.

Even counsel's belief about conflicts do not serve to sever the relationship. Any police motivations, including the desire to resolve a case, are irrelevant. The police cannot use the

excuse they did not know a defendant was represented or that they were confused regarding the degree of representation.

The petitioner could not validly waive her right to have her retained counsel present for her 2017 statement being that counsel's presence was required before this was waived. It was completely improper for police to ambush defense counsel at an in-camera meeting for a separate client and ask him if he still represented someone from twelve years ago (tr 2/6/18 at 43). It was also improper for the police to rely on assertions from the prosecutor that he believed defense counsel no longer represented the petitioner (tr 2/6/18 at 68).

The petitioner was not required to reassert to police a right that she exercised in 2005 and never abandoned (tr 2/6/18 at 69). The mere fact that her attorney believed the relationship terminated did not excuse the requirement for police to have counsel present before any waiver was signed (tr 2/6/18 at 40-41). The court erred by determining that the police and the prosecution were entitled to exercise discretion to determine whether the right to counsel remained through the passage of time.

These notions should not have been considered at all. This is not a call for the police to make. This is not a call for the prosecution to make. A determination and interpretation of such ignores the profound purpose of the constitutional protections afforded to citizens accused of crimes and undermines what the right to counsel means.

The police and prosecution were not entitled to interfere with this attorney-client relationship. But they did so for their own gain. Allowing the police to ignore this right by separating counsel and client would destroy the concept of the indelible right to counsel. It also creates an incentive to prolong investigations if they believe that the exercised right to counsel

fades over time. This right is far too important for the prosecutor, police, and defense counsel to toss aside.

Furthermore, the admission of the evidence at issue, received by police from petitioner in 2017, was not harmless (brief for respondent at 15). The petitioner's 2017 statement constituted nearly half of the People's PowerPoint summation. In this instance, the accused made an unjust judgment. Had retained counsel been present to make the wavier, the statement would not have occurred; this is precisely what the system is designed to prevent. Where counsel is absent, the system as a whole suffers. The evidence seized in 2005, as a result of those documents signed in the absence of defense counsel, should have been suppressed as they were taken in violation of the right to counsel. Finally, the "interrogation of the defendant, when occurring after the attachment of the right to counsel, is a critical stage at the proceedings, entitling a defendant whose Sixth Amendment right attached to the assistance of counsel during the interrogation" (Michigan v Jackson, 475 US 625).

**Ground Three:** Violation of Petitioner's Federal Due Process right of legally sufficient evidence. U.S.C.A. 14.

The Petitioner's case was full of guesswork and speculation, such that the evidence does not justify the conviction. The case was wholly circumstantial and far from overwhelming, with no motive, as the trial court itself and the People noted. At the conclusion of the trial, no DNA evidence connected the petitioner to the murder itself. In fact, other *male* DNA profiles were discovered, and to this day are still unknown, showing that others were present at the murder scene. The DNA excludes the Petitioner.

The victim in this case was the petitioner's mother. Out of instinct, upon finding her mother brutally murdered, petitioner immediately went for help and returned to her mother's side in an attempt to resuscitate her, where she became panicky and hysterical. This resulted in the victim's blood being on the Petitioner's clothing. Petitioner's movement and actions were corroborated by the People's witnesses.

Regarding the blood "evidence," there was no question from the "expert" or common sense that it was reasonable to expect that the Petitioner would have large patches of blood on her shirt from holding her mother (id. at 843). But it was also his belief that the tiny drop of blood on the defendant's back could only come from being the murderer (id. at 847). If this is to be believed, that would mean that somehow, during a brutal massacre that left blood on nearly every surface and area of the bedroom, only a tiny speck landed on the back of her clothing. What this is consistent with, although the "expert" tried hard not to admit, was that the blood could have ended up on the back of the petitioner's clothing from hugging her (id. at 843). It also could have come from when the petitioner was flailing her arms in uncontrollable grief (id at 844-845). All this was consistent with the postal worker's testimony, who was the People's witness, that the defendant *was* hysterical (id at 510). She was screaming (id at 532-533). Her arms were moving about (id at 500). Other witnesses had to pull her off her dead mother when the EMT's arrived (id at 534). The petitioner's behavior was more consistent with grief than it was with homicidal intent. Furthermore, blood on the petitioner's person does not mean she committed the crime.

But the reasonable doubt does not end there. The People's theory was that the defendant entered the victim's home and spontaneously committed the crime, without motive. It is not disputed by the People or the defendant that she never left the scene. However, the handle of the

9

knife used on the victim was never recovered. This fact alone strongly suggests that whoever committed the crime took the knife handle with them.

There are more problems with the People's case that make the case for dismissal even more compelling. For example, the other DNA profiles remain unmatched (Tr at 935). The police never bothered to swab areas where there was a strong possibility DNA from the murderer would have been found (id at 618, 776). The petitioner's DNA was in none of the places one would expect had she violently murdered her mother. The DA ignored the most likely reason for this: It was not there because she did not kill her mother. There is no way the petitioner could have rid a bloodied bedroom of all traces of her presence for a crime the People allege was spontaneous.

It was clear that the evidence is not legally sufficient to support the conviction because the only evidence connecting the petitioner to the crime is a stale statement from an unreliable witness (See the conditional exam- Ramona Wallace pp 36-37) whose testimony changed several times throughout both trials. Additionally, her testimony is wholly inconsistent with the evidence, such as her alleging that there was a jewelry theft—there was not; that she and petitioner went to the scene of the crime—they did not; and that there were money problems between petitioner and the victim—there was not. Also, alarmingly, she openly admitted that she has lied to law enforcement, repeatedly, and that she knows what to say to get what she wants. The statement by Ramona Wallace standing alone is legally insufficient to support a conviction of second-degree murder.

The jury's verdict did not include all reasonable inferences of innocence that could be drawn from the evidence, as required in circumstantial evidence cases. Rather, they considered the evidence in isolation (the statement) and not in its totality (as weighed against exculpatory

evidence like the missing murder weapon, the petitioner's lack of wounds, and unknown male DNA).

It is clear there were a number of inconsistencies with guilt or that are consistent with innocence, such that it was legally improper to determine that every element of the crime had been proven. In <u>In re Winship</u>, 397 US 358, the Supreme Court asserted that "a defendant is entitled to an acquittal of the specific crime charged, if upon all the evidence, there is reasonable doubt whether he was capable in law of committing the crime."

For these reasons, the conviction involved an unreasonable application of the established federal law regarding reasonable doubt. The petitioner was convicted based upon the People's theory and a mere belief that the petitioner committed the crime. The People ignored critical discrepancies between their theory and reality. Consider the missing murder weapon alone, a fact that does not coincide with their own theory.

Justice requires more than a hunch. And the Due Process clause of the Fourteenth Amendment prohibits such convictions. A different verdict was not only possible, but actually happened when the first jury deadlocked.

At the end of trial, no DNA evidence connected petitioner to the murder itself. Other DNA profiles were unexplained. There was no evidence about the time of death. There was no testimony of there being any animosity between the victim and petitioner. In fact, the victim's husband testified that the two were very close. In a 2016 police interview, the victim's husband stated, "It seems you suspect her [the petitioner] and this is another case in which family kills family, but not this time."

The only "evidence" that connected petitioner to the offense were statements from jailhouse snitches, following petitioner's 2017 arrest, that the petitioner barely knew but somehow, allegedly, suddenly confessed to 12 years later. These jailhouse snitches were looking to have their sentences reduced after reviewing petitioner's legal documents (tr at 636, 686 [witness admitting that she saw transcripts and legal documents from petitioner's case]). Or the petitioner allegedly confessed to a woman who enjoyed ratting people out "thousands" of times, including her family, and enjoyed making false police reports (id at 45, 55-56).

Furthermore, a clear physical struggle took place between the victim and the assailant, where the victim was fighting for her life. The petitioner, who had never left the scene, encountered immediate police contact and had no marks, bruises, scratches, or cuts on her person, which would be expected had she committed the crime where the victim fought back. And again, the missing piece to the murder weapon would have been present surrounding the circumstances.

The People's story is not plausible, being that there is no way the petitioner perfectly cleaned a bloodied bedroom of all traces of her presence. That would require significant time, effort, and planning for a crime the People alleged was spontaneous. Maybe there would be traces of cleaning solution. Maybe they would have found the knife handle (id at 605). In the People's brief on direct appeal, they admit "that the blood could have gotten on the defendant either by trying to revive the victim or from committing the crime (People's brief- pg 15)." It is clear they do not know what happened, but the People glossed over the inconsistencies.

There was no canvassing of the area to find the murderer. There was no thorough investigation to find the knife handle. No swabs were taken to of the other areas the murderer would have touched (id at 616-617). The police failed to investigate whom the other DNA

profiles belonged to. They failed to investigate other suspects, one of which died, including the victim's ex-boyfriend, even knowing that the residence had been targeted for a burglary and an arson in the past (tr at 484-485, 490-491). Because of their decision to sit on the case for twelve years, evidence degraded (tr at 941).

Those failures were critical and mean that there are too many questions in this case that the People never resolved. While there is no question there was a murder, there are substantial questions that linger about *who* killed the victim. A belief that the petitioner may have done this is not enough. Justice requires more.

**Ground Four:** Deprived of Due Process Right to Legal Standard of Admissibility of Novel Scientific Evidence in Violation of USCA 14.

Junk science has no place in a courtroom. The state court erred in denying petitioner a *Frye* hearing to determine if the testimony from a hobbyist was admissible. Petitioner was hysterical when she found her mother. She tried to wake her mother up in any way possible. She hugged her. She touched her. She shook her. But her mother was already gone. She screamed in despair, flinging her arms in the air. She ran outside to find help. A postal employee was outside the home and followed the petitioner, still hysterical and crying, to where her mother lay. She continued touching her mother, trying to wake her. A neighbor appeared and entered the home. When the emergency medical team arrived, the neighbor had to pull the distraught petitioner off her mother.

Naturally, after all the hugging and contact, the petitioner's clothing was covered in blood. After she was interrogated by police immediately following the murder of the victim,

pictures were taken of her clothing and her clothing was seized as evidence. She was not arrested.

Within several days of the incident, the Erie County District Attorney's Office consulted a retired Canadian policeman and deemed him a "blood spatter expert." He requested more photos of the scene. He ultimately issued his "conclusion" that the blood spatter indicated that petitioner was the assailant. He came to this conclusion because the petitioner allegedly had a miniscule spot of blood on her back.

Although there was an immense struggle between the assailant and the victim, as evidenced by the blood spattered on nearly every surface in the room, the expert had no explanation to reconcile the petitioner's relative cleanliness. The petitioner would have had multiple spatters on her person had she been the assailant. Her DNA was nowhere in the room. It was not under the victim's fingernails. It was nowhere in the house except for in a trash bag in the basement. An unknown DNA profile was located in the house, in the area of the murder, and was never resolved.

Following a deadlocked jury at the first trial, petitioner was retried. Before the prosecutor introduced the blood spatter testimony, defense counsel requested a *Frye* hearing to fully discuss the issues with blood spatter evidence. Defense was concerned with the lack of scientific backing to support the People's witness. The request was denied and the People's "expert" was able to give testimony based on his hunch that involved no scientific technique. The *Frye* test relies on theory as well as focus on the technique. The Second Circuit was one of the first jurisdictions to abandon the *Frye* methodology in favor of a more scientifically minded approach, similar to that provided by Fed R Evid 403 to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice.

In the "expert's" testimony, he made several key admissions about his field that reaffirmed counsel's earlier found discrepancies with his testimony. Notably, defense highlighted a federal report supplied by defense counsel, from the National Academy of Sciences that called the validity of blood spatter theories into question. The report noted "enormous" problems with blood spatter testimony, citing the "uncertainties associated with bloodstain pattern analysis." The "expert" admitted that there was no way to accurately reproduce blood spatter. Most noteworthy is his admission that he had "no clue" about the rate of error for his "studies." He never obtained specific measurements or anything else from the scene to support any "conclusions." Therefore, the testimony was unreliable and speculative.

The petitioner has challenged the admissibility of the blood spatter testimony on direct appeal as well as the Court of Appeals. With the lack of DNA evidence or any admissions from the petitioner, this blood spatter testimony was the basis of the prosecution's case.

The admission of reliable and competent evidence is critical to ensuring that due process is satisfied. *Frye* was adopted to avoid unreliable and speculative sciences from being utilized at trial. Citizens facing criminal charges must be able to meaningfully participate in and challenge evidence where their liberty interests are at stake. Ake v Oklahoma, 470 US 68. Defendants are denied due process where they have no way to challenge evidentiary rulings that are arbitrary and disproportionate to the purposes they are designed to serve. Holmes v South Carolina, 547 US 319.

In this case, the expert testimony did not constitute credible scientific knowledge. Nor was there any reasoning or methodology to back up his testimony. It is not scientifically valid and cannot be applied properly to the facts at issue in this case. For the above-mentioned reasons, the petitioner's Due Process right to challenge the admissibility of novel science was violated.

15

The evidence was unfairly prejudicial to the extent that it caused the jury to decide the case on improper grounds. The trial court's reason for denial of defense counsel's request for a *Frye* hearing was that courts have accepted this type of evidence in the past (Tr at 323); this was not correct because past admissibility does not mean that evidence should automatically be admitted, especially in light of prestigious scientific establishments' recent and supported criticism of blood spatter evidence.

This is not a case that involved harmless error. The People's case centered on a minuscule spot of blood on petitioner's back. The People asked lay witnesses about blood spatter evidence and their summations were filled with references to the blood spatter conclusions.

In closing, the *Frye* standard was not satisfied here because there was a lack of general acceptance about the reliability of blood spatter evidence. Even from the federal government, that decries the use of blood spatter testimony in court.

## Conclusion:

For the aforementioned reasons, defendant's petition for relief from prison custody pursuant to 28 USCA §2254 for a Writ of Habeas Corpus should be granted.

This petition is signed under the penalty of perjury.

Respectfully,

LaShawn Lewis (18G1036)
Petitioner *Pro Se*
BHCF 247 Harris Rd
Bedford Hills, NY 10507

## AFFIDAVIT OF SERVICE

I, LaShawn Lewis, do swear under penalty of perjury, pursuant to 28 USCA §1746, that I am the petitioner in this proceeding and I do swear that I have on September 25, 2023 duly mailed via first class US Postal Service, by depositing in the facility mail bag and designated as legal mail, the following documents: Petitioner under 28 USCA 2254; Motion to Proceed as a Poor Person and Supporting Affirmation; Application for Appointment of Counsel; and this Affidavit of Service to the following parties:

US District Court- Western District
Attn: Court Clerk
2 Niagara Sq
Buffalo, NY 14202

(*original and two copies*)

Respectfully,

LaShawn Lewis (18G1036)
Petitioner *Pro Se*
BHCF 247 Harris Rd
Bedford Hills, NY 10507

17

# Addendum:

A.) *Singer* Hearing Testimony ...................................................................................A 1

B.) Fourth Dept Decision- *People v LaShawn Lewis* ........................................................A 2

C.) Court of Appeals Decision ...................................................................................A 3

D.) Writ of Certiorari Decision ..................................................................................A 4

# KEVIN W. SPITLER

## Attorney and Counselor-at-Law

181 FRANKLIN STREET, SUITE 300 • BUFFALO, NEW YORK 14202
TEL: (716) 849-7102 • FAX: (716) 849-7107
E-MAIL: kws@kevinwspitler.com • WEBSITE: www.kevinwspitler.com

May 24, 2018

Hon. Christopher J. Burns                    **HAND DELIVER**
NYS Supreme Court, Part 19
25 Delaware Ave.
Buffalo, NY 14202

      Re:   People v. Lewis
           #01978-2005

Dear Judge Burns,

      I submit this letter in support of my motion to dismiss the Indictment because Ms. Lewis' due process rights were violated by the Buffalo Police Department and the Erie County District Attorney's Office and to suppress her clothing seized after she had retained counsel.

      I cite the following testimony from the Singer hearing held on May 21, 2018:

      **Sharon Acker, Buffalo Police Department** – P.O. Acker had an opinion that Lashawn Lewis killed her mother *(Hearing Transcript [H.T.] p. 15, l. 10-13)*. Officer Acker was never questioned by members of the Erie County District Attorney's Office about her observations as the first officer on the scene *(H.T. p. 15, l. 14 to p. 18, l. 6)*. Failure on the part of Detective Lauber or any other cold case detective to speak with P.O. Acker violated Ms. Lewis' due process rights. Failure of any members of the District Attorney's Office to question P.O. Acker during the 12 years between August 4, 2005 and November 2017 violated Ms. Lewis' due process rights.

      **Detective Mark Lauber, Buffalo Police Department** – Det. Lauber should have known of the Ramona Wallace statement and photo array/affidavit because he was the lead detective on the case *(H.T. p. 23, l. 9)*. Det. Lauber made a note to

Page 1 of 4

interview Ramona Wallace on September 10, 2005. He failed to do so. Det. Lauber states that Det. Stambach never told Det. Lauber that Det. Stambach interviewed Ramona Wallace (H.T. p. 42, l. 9-12). Det. Lauber stated that interviewing Ramona Wallace was very important (H.T. p. 42, l. 21-24). Det. Lauber's failure to act violated Ms. Lewis' due process rights.

Det. Lauber also violated Ms. Lewis right to counsel when he took her clothing, aware of counsel representing her (H.T. p. 49, l.19-23). Det. Lauber knew that without the consent, a Search Warrant would be required and if taken without a search warrant, the clothes would be suppressed (H.T. p. 50, l. 3-23).

**Detective Mark Stambach, Buffalo Police Department** – Det. Stambach took Ramona Wallace's statement, conducted a photo array and obtained a photo array affidavit (H.T. p. 52 l. 13). Det. Stambach testified how he went about putting the statement in the file and letting Det. Lauber know it was there (H.T. p. 77, l. 8; p. 78, l. 23). The failure of Det. Lauber and other Buffalo Police Department personnel and members of the Erie County District Attorney's Office to follow up with Det. Stambach, who had taken a statement from Ms. Lewis and Ramona Wallace, violated Ms. Lewis' due process rights.

**Hon. Frank A. Sedita, III, J.S.C.** – Judge Sedita testified that the Ramona Wallace statement changed the entire dynamic. He was the lead prosecutor in 2006. He testified that without the Ramona Wallace statement, he would not have authorized the arrest of Ms. Lewis (H.T. p. 103, l. 4-11). He stated without the Ramona Wallace statement, there was insufficient evidence to charge Ms. Lewis (H.T. p. 105, l. 2-7). Judge Sedita testified that without the Ramona Wallace statement, the difference made to the case was, "night and day" (H.T. p. 106, l. 11). It would have given the case a "much, much different dynamic" (H.T. p. 107, l. 2). On cross examination, Judge Sedita confirms that with the Ramona Wallace statement, the case would have gone to the Grand Jury (H.T. p. 110, l. 11-16). Judge Sedita agrees that a 12-year delay could be detrimental to a defendant (H.T. p. 111, l. 1-4).

**Colleen Curtin Gable, Erie County District Attorney's Office, Chief Homicide Bureau** – Ms. Curtin Gable first reviewed the DOE file in 2009. Like others before her, she declined to present the case to a Grand Jury (H.T. p. 129, l. 17-59). Ms. Curtin Gable met with Det. Mary Evans on April 18, 2016 and was shocked to see for the first time the Ramona Wallace statement, photo array and affidavit (H.T. p. 131, l. 15-23). The Court questioned if subsequent DNA testing after the April 18, 2016 viewing of the Ramona Wallace statement would add to the quality of the case. Ms. Curtin Gable stated that without the Ramona Wallace

statement, there was insufficient evidence to go forward *(H.T. p. 137, l. 2-5)*. Ms. Lewis' right to due process was violated by the reported failure of the Buffalo Police Department Homicide Bureau and the Erie County District Attorney's Office to properly investigate, file and review Ramona Wallace's statement.

**Detective Brian Ross, Retired Buffalo Police Department Cold Case Detective** – Det. Ross saw the Ramona Wallace statement when he reviewed the file as a Cold Case Detective in May 2011 *(H.T. p. 143, l. 5-7)*. He testified that he did not share it with the District Attorney's Office because he figured they had it *(H.T. p. 142, l. 3-8)*.

**Detective Lissa Redmond, Retired Buffalo Police Department Cold Case Detective** – Det. Redmond saw the Ramona Wallace statement in the file in 2014. She did not contact the Erie County District Attorney's Office *(H.T. p. 150, l. 1-6)*.

**Detective Mary Evans, Buffalo Police Department** – Det. Evans found the Ramona Wallace statement in the file just like other Buffalo Police Department detectives did *(H.T. p. 163, l. 17-25)*. On cross examination, Det. Evans agreed the Buffalo Police Department made a mistake regarding the P. 73 of Ramona Wallace's statement *(H.T. p. 174, l. 10-24)*.

Based upon all the testimony mentioned here, Ms. Lewis' due process right was violated. If the prosecutor argues their office didn't know about the Ramona Wallace statement, they ignore the presumption that what the police know, the prosecutor knows. This is akin to a law office error argument and is not excusable. It is clear that all persons charged with a crime are entitled to due process under the law. To not dismiss this Indictment is to hold that a defendant charged with murder is not entitled to due process because the charge is murder. That cannot and should not be the law.

As to the seizure of Ms. Lewis' clothing, her right to counsel was violated and the clothes and any testing done on them should be suppressed.

Thank you.

Very Truly Yours,

Kevin W. Spitler

199 A.D.3d 1441

Supreme Court, Appellate Division,

Fourth Department, New York.

The **PEOPLE** of the State of New York, Respondent,

v.

LaShawn **LEWIS**, Defendant-Appellant.

797

|

KA 19-00669

|

Entered: November 19, 2021

Appeal from a judgment of the Supreme Court, Erie County (Christopher J. Burns, J.), rendered November 8, 2018. The judgment convicted defendant upon a jury verdict of murder in the second degree.

**Attorneys and Law Firms**

THE LEGAL AID BUREAU OF BUFFALO, INC., BUFFALO (ERIN A. KULESUS OF COUNSEL), FOR DEFENDANT-APPELLANT.

JOHN J. FLYNN, DISTRICT ATTORNEY, BUFFALO (DAVID A. HERATY OF COUNSEL), FOR RESPONDENT.

PRESENT: CENTRA, J.P., LINDLEY, TROUTMAN, BANNISTER, AND DEJOSEPH, JJ.

MEMORANDUM AND ORDER

It is hereby ORDERED that the judgment so appealed from is unanimously affirmed.

Memorandum: Defendant appeals from a judgment convicting her upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]). We reject the contention of defendant in her main and pro se supplemental briefs that she was denied her state constitutional due process rights based upon the 12-year preindictment delay in this case (*see generally People v. Singer*, 44 N.Y.2d 241, 253, 405 N.Y.S.2d 17, 376 N.E.2d 179 [1978]). In determining that the **People** met their burden of establishing good cause for the delay in prosecuting defendant (*see generally People v. Decker*, 13 N.Y.3d 12, 14, 884 N.Y.S.2d 662, 912 N.E.2d 1041 [2009]; *Singer*, 44 N.Y.2d at 254, 405 N.Y.S.2d 17, 376 N.E.2d 179),

Supreme Court properly applied the factor set forth in *People v. Taranovich*, 37 N.Y.2d 442, 373 N.Y.S.2d 79, 335 N.E.2d 303 (1975), i.e., "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay" (*id.* at 445, 373 N.Y.S.2d 79, 335 N.E.2d 303). Although the length of the delay in this case weighs in defendant's favor, "it is well established that the extent of the delay, standing alone, is not sufficient to warrant a reversal" (*People v. McFadden*, 148 **A.D.**3d 1769, 1771, 50 N.Y.S.3d 762 [4th Dept. 2017], *lv denied* 29 N.Y.3d 1093, 63 N.Y.S.3d 9, 85 N.E.3d 104 [2017]; *see People v. Chatt*, 77 **A.D.**3d 1285, 1285, 908 N.Y.S.2d 500 [4th Dept. 2010], *lv denied* 17 N.Y.3d 793, 929 N.Y.S.2d 101, 952 N.E.2d 1096 [2011]). Here, the **People** established at the *Singer* hearing that the District Attorney's Office brought charges after prosecutors uncovered a statement made by a crucial witness informing the police that defendant admitted committing the crime. The delay was in no part caused by any bad faith on the part of the **People** but, rather, was attributable to the mishandling of the witness's statement by the police department. Under these circumstances, we conclude that the **People** provided *\*604* an " 'acceptable excuse or justification' for the delay" (*McFadden*, 148 **A.D.**3d at 1771, 50 N.Y.S.3d 762; *see People v. Gaston*, 104 **A.D.**3d 1206, 1206, 960 N.Y.S.2d 590 [4th Dept. 2013], *lv denied* 22 N.Y.3d 1156, 984 N.Y.S.2d 640, 7 N.E.3d 1128 [2014]). Furthermore, it is undisputed that the underlying charge is a serious offense and that defendant was not incarcerated during the delay, and "there is no indication that the defense was significantly impaired by the delay" (*Decker*, 13 N.Y.3d at 15, 884 N.Y.S.2d 662, 912 N.E.2d 1041; *see People v. Rogers*, 103 **A.D.**3d 1150, 1151, 958 N.Y.S.2d 835 [4th Dept. 2013], *lv denied* 21 N.Y.3d 946, 968 N.Y.S.2d 8, 990 N.E.2d 142 [2013]).

Defendant further contends in her main brief that the court erred in refusing to suppress statements that she made to the police in 2017 and certain evidence obtained thereafter on the ground that such statements and other evidence were obtained in violation of her indelible right to counsel. We reject that contention. Initially, as the **People** correctly concede, defendant's indelible right to counsel attached in 2005 when an attorney appeared in the case on defendant's behalf (*see generally People v. Grice*, 100 N.Y.2d 318, 321, 763 N.Y.S.2d 227, 794 N.E.2d 9 [2003]). "The mere passage of time is insufficient to eradicate the attorney-client relationship" (*People v. Felder*, 301 **A.D.**2d 458, 459, 754 N.Y.S.2d 18 [1st Dept. 2003]), and it was the burden of the

ADDENDUM: C

## New York
Official Reports

38 N.Y.3d 1034, 189 N.E.3d 325, 169 N.Y.S.3d 218 (Table)

**People v Lewis** (Alexander)

Court of Appeals of New York
5/12/22

CITE TITLE AS: **People v Lewis**

1st Dept: 204 AD3d 502 (**NY**)

APPLICATIONS IN CRIMINAL CASES FOR LEAVE TO APPEAL

denied 5/12/22 (Rivera, J.)

Copr. (C) 2023, Secretary of State, State of New York

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADDENDUM: D

143 S.Ct. 262
Supreme Court of the United States.

Lashawn LEWIS, Petitioner,

v.

NEW YORK.

No. 22-5308
|

Oct. 3, 2022

Case below, 199 A.D.3d 1441, 154 N.Y.S.3d 603.

**Opinion**

Petition for writ of certiorari to the Appellate Division, Supreme Court of New York, Fourth Judicial Department denied.

**All Citations**

143 S.Ct. 262 (Mem), 214 L.Ed.2d 114

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

B.H.C.F
LaSHAWN LEWIS (18G1036)
247 HARRIS ROAD
BEDFORD HILLS, NY
10507

USDC - WDNY
OCT 0 2 2023
BUFFALO

Clerk
United St
Western
2 N
Buff

* LEGAL

EDFORD HILLS
ORRECTIONAL

FACILITY

Bedford Hills



Correctional Facility

NEOPOST          PRIORITY MAIL
09/27/2023
US POSTAGE $010.55⁰



ZIP 10507
041M11272300

f the Court

tes District Court

istrict of New York

iagara Square

alo, NY 14202

Mail ✳