UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LASHAWN LEWIS, 18-G-1036

                    Petitioner,

            v                                    23-CV-06567-DGL

EILEEN RUSSELL,

                    Respondent.

---

**MEMORANDUM OF LAW**

                              JOHN J. FLYNN
                              Erie County
                              District Attorney

JERRY MARTI
Assistant District Attorney
of Counsel
Attorney for Respondent
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, New York  14202
(716) 858-2447
jerry.marti@erie.gov

# TABLE OF CONTENTS

Page

Background.............................................. 1

Point One.    Petitioner failed to establish due
              process claim based on pre-indictment
              delay...................................  4

Point Two.    Petitioner was no longer represented by
              an attorney and waived her right to
              counsel when police obtained evidence;
              In any event, any violation was
              harmless error..........................  9

Point Three.  Petitioner failed to exhaust remedies
              in state court prior to seeking federal
              habeas relief; Additionally, the
              evidence was legally sufficient to
              support the conviction .................  14

Point Four.   Based on the relevance and reliability
              of the expert's testimony, petitioner
              has failed to establish a due process
              claim based on the court's denial of
              a *Frye* hearing ........................  21

Conclusion.............................................  25

By Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, LaShawn Lewis claims that she is in custody in violation of the Constitution or laws of the United States. An Answer to the Petition is filed with this Memorandum of Law.

Under Indictment No. 01978-2005, petitioner was charged with Murder in the Second Degree in violation of N.Y. Penal Law § 125.25(1) for the fatal stabbing of her mother, Lateyfa Lewis. The first trial ended in a mistrial after the jury was unable to reach a unanimous verdict. At the second trial, defendant was found guilty as charged.

She was sentenced to an indeterminate term of twenty-five years to life imprisonment.

### The Direct Appeal

Petitioner appealed the judgment. On direct appeal, petitioner presented six points: the pre-indictment delay violated her due process rights; she was entitled to a *Frye* hearing; the conviction was against the weight of the evidence; the physical evidence and her statements were taken in violation of the right to

counsel and should have been suppressed; prosecutorial misconduct based on the use of improper expert testimony, overstating the evidence, and appealing to the jury's sympathies with inflammatory remarks; the sentence was harsh and excessive and the court erred by denying her right to rebut statements made at sentencing.

On November 19, 2021, the Appellate Division, Fourth Department unanimously affirmed the judgment. *People v Lewis*, 199 A.D.3d 1441, 154 N.Y.S.3d 603 (Mem) (4th Dep't 2021).

On May 11, 2022, the Court of Appeals denied leave. *People v Lewis*, 38 N.Y.3d 1034, 169 N.Y.S.3d 219, 189 N.E.3d 326 (Table) (2022).

### The Petition for Writ of Certiorari

On October 3, 2022, the petition for a writ of certiorari was denied. *Lewis v. New York*, 143 S.Ct. 262 (Mem), 214 L.Ed.2d 114 (2022).

### The Habeas Corpus Petition

Petitioner presents four grounds for relief: the pre-indictment delay of 12 years violated her rights to due process under the Fifth and Fourteenth Amendments; the physical evidence and petitioner's statements were taken in violation of her right to

counsel under the Sixth and Fourteenth Amendments; the evidence was legally insufficient to support the conviction, and therefore, violated her due process rights under the Fourteenth Amendment; and the denial of defendant's request for a *Frye* hearing violated her due process rights under the Fourteenth Amendment. For the reasons set forth below, the petition must be denied.

**PETITIONER FAILED TO ESTABLISH DUE PROCESS CLAIM BASED ON PRE-INDICTMENT DELAY.**

Petitioner initially contends that she was deprived of her due process rights under the Fifth and Fourteenth Amendments based on the pre-indictment delay of twelve years. Petitioner has failed to meet her heavy burden in establishing this claim.

It is well settled that prosecutors, in their ethical and professional duties, may not recommend an indictment on less than probable cause. "It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *United States v. Lovasco*, 431 U.S. 783, 791 (1977).

To establish a due process claim, petitioner carries the heavy burden of proving that the pre-indictment delay "caused substantial prejudice to [her] rights to a fair trial and . . . was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971); *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979), *cert. denied*, 444 U.S. 994 (1979).

Here, there was no proof that the prosecution intentionally used the pre-indictment delay as a tactical advantage. The lead prosecutor from 2006 until January 2009, the Hon. Frank A. Sedita, III, J.S.C., and former Erie County District Attorney with 27 years' prosecutorial experience, initially reviewed the investigatory file. Hr'g Tr., 88-89, 99, 107, May 21, 2018.

While petitioner became a suspect based on the blood splatter on her clothing and an indication of a struggle from the earring found at the murder scene, it remained a circumstantial case. There were no eyewitnesses, admissions, or other direct evidence linking petitioner to the crime. As such, there was insufficient evidence to warrant a Grand Jury presentation. Hr'g Tr., 98-99, 103-105, May 21, 2018.

In June 2009, Assistant District Attorney Colleen Curtin Gable received the assignment to review the file. At the time, there was no new information from the police department, such as eyewitnesses or admissions. For this reason, there remained insufficient evidence to proceed forward with formal charges. Hr'g Tr., 121, 123, 129, May 21, 2018.

But, this changed during a meeting between Chief Gable and Detective Evans on April 18, 2016 when the prosecution learned of new evidence for the first time. Chief Gable learned of a December 2005 statement by Ramona Wallace. This statement made a huge difference in the case because it corroborated the circumstantial evidence. As a result, the investigation led to the indictment and arrest of petitioner on November 7, 2017. Hr'g Tr., 130-132, 172-173, May 21, 2018.

Admittedly, miscommunication between detectives had contributed to the confusion over Wallace's statement. The lead detective, Mark Lauber, did not have any knowledge or notification of Ramona Wallace's statement until May 2018. Hr'g Tr., 24, 36-37, 42, May 21, 2018. Meanwhile, Detective Mark Stambach took Ramona Wallace's statement in December 2005. While the detectives had minimal contact with one another, Detective Stambach recalled that he had notified Detective Lauber about the statement through internal correspondence, better known as a P-73 form, and attached these documents to the front of the homicide file. In 2006, Detective Stambach retired from the police department. Hr'g Tr., 73-79, 82, May 21, 2018.

Only after Detective Mary Evans was assigned to the case in January 2016, it was learned that Wallace's statement was not in the statements subfolder, it had not been entered in the inventory list, and there was no P-73 form in the file. Hr'g Tr., 162-164, 168, 176, May 21, 2018. Despite the internal misfiling of the statement, there was no proof that the detectives sought to delay the criminal prosecution of petitioner.

While acknowledging that a delay of 12 years could be detrimental or beneficial to petitioner, the lead prosecutor from 2006 to 2009 did not delay moving the case to the Grand Jury to gain an advantage over petitioner. Likewise, the next prosecutor was not motivated in any way to gain a tactical advantage over petitioner by not going forward with charges. Indeed, there was no strategic benefit for the prosecutors in delaying the criminal prosecution. Hr'g Tr., 110-111, 129-130, 135-136, May 21, 2018.

Moreover, there was no evidence of recklessness on the part of the prosecution. In order to appreciate the risk of a lengthy delay, the prosecution must first have been made aware of the statement. *See Lovasco*, 431 U.S. at 795 n.17. Accordingly, petitioner has failed to show that the pre-indictment delay was used to gain a tactical advantage in this case.

Likewise, petitioner's claims of prejudice fall far short of establishing a due process claim. Even if memories dim, witnesses become unavailable, and evidence is lost, this in and of itself does not establish that petitioner cannot receive a fair trial. *See Marion*, 404 U.S. at 326. It is also unclear how DNA evidence would have exonerated petitioner since she was found by police in bloody clothing next to the deceased victim's body and later admitted to killing her mother to different individuals. Hr'g Tr., 7, May 21, 2018; Trial Tr., vol. 1, 28, Sept. 6, 2018; Trial Tr., vol. 5, 633, Sept. 13, 2018. At best, petitioner's prejudice claim remains speculative.

Accordingly, petitioner has failed to sustain her burden in demonstrating a due process claim premised upon the pre-indictment delay.

## POINT TWO

**PETITIONER WAS NO LONGER REPRESENTED BY AN ATTORNEY AND WAIVED HER RIGHT TO COUNSEL WHEN POLICE OBTAINED EVIDENCE; IN ANY EVENT, ANY VIOLATION WAS HARMLESS ERROR.**

Petitioner alleges that the evidence seized in 2005 following the invocation of her right to counsel and the statement and buccal swab obtained in 2017 should have been suppressed as they were taken in violation of her right to counsel. Since petitioner was no longer represented by an attorney and waived her right to counsel in 2017, her claim is without merit. In any event, any evidence obtained in 2005 was harmless error.

An "attorney-client relationship created between a lawyer and a lay party is terminated, simply enough, by the accomplishment of the purpose for which it was formed in the first place." *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F.Supp.2d 381, 389 (S.D.N.Y. Feb. 1, 2010).

Petitioner's right to counsel attached on August 4, 2005. While petitioner was under interrogation for her mother's murder, John Ange, Esq. was retained to represent her. Ange immediately notified Buffalo Police Headquarters that he was asserting her

right to remain silent and asked that all questioning stop.  Hr'g Tr., 39, 42-43, Feb. 6, 2018; Appellant App. 160.

Following August 4, 2005, Ange recalled only one other specific action taken on her behalf.  Hr'g Tr., 40, Feb. 6, 2018. Since Ange accomplished his purpose, the attorney-client relationship terminated thereafter.  *Revise Clothing* at 391. According to Ange, the attorney-client relationship had ended before his discussion with Assistant District Attorney Partridge in 2017.  Even before 2017, Ange told a homicide detective that he no longer represented petitioner.  Hr'g Tr., 40-45, Feb. 6, 2018.

On October 12, 2017, Detective Mary Evans and Investigator Salvatore Valvo interviewed petitioner.  Prior to the interview, Investigator Valvo confirmed with Assistant District Attorney Partridge that Ange no longer represented petitioner. Additionally, petitioner confirmed that she was no longer represented by Ange and could not even recall his name.  Hr'g Tr., 62-63, 67-69, Feb. 6, 2018.  Accordingly, petitioner was not represented by counsel on October 12, 2017.

Likewise, petitioner waived her right to counsel.  "As a general matter, then, an accused who is admonished with the

warnings prescribed by this Court in *Miranda*, 384 U.S., at 479, 86 S.Ct., at 1630, has been sufficiently apprised of the nature of [her] Sixth Amendment rights, and of the consequences of abandoning those rights, so that [her] waiver on this basis will be considered a knowing and intelligent one." *Patterson v. Illinois*, 487 U.S. 285, 296 (1988).

Here, petitioner waived her *Miranda* rights after they were provided by Investigator Valvo. Contrary to petitioner's assertions at the suppression hearing, the investigator did not downplay her constitutional rights. The investigator explained that the process of putting her initials on the *Miranda* card was not a big deal. Hr'g Tr., 69-70, 74, Feb. 6, 2018. Since petitioner's waiver was knowing and intelligent, the trial court was well within its discretion to deny suppression of her 2017 statement.

In addition, petitioner consented to the taking of her DNA evidence by buccal swab. Specifically, petitioner acknowledged her consent before signing a specimen release form, which stated that she voluntarily agreed to the specimen and that she was aware of the nature and purpose of such specimen collection. Hr'g Tr., 71, 90, Feb. 6, 2018; Appellant App. 155. Under the totality of

the circumstances, the search conducted pursuant to petitioner's consent was reasonable and constituted an exception to the warrant requirement. *See United States v. Owens*, No. 06-CR-72A, 2006 WL 3725547, at *5 (W.D.N.Y. Dec. 15, 2006).

To the extent that petitioner argues that her statements in 2005 should have been suppressed based on her right to counsel, it was harmless error. Respondent acknowledges that incriminating statements obtained after right to counsel has attached are inadmissible at trial. *See Massiah v. United States*, 377 U.S. 201, 204-205 (1964). Nonetheless, an error is harmless unless it had a "substantial and injurious effect" on the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (quoting *Brecht v. Abrahmson*, 507 U.S. 619, 637 (1993)).

Following notification of petitioner's representation by counsel, petitioner gave two statements without any admission of guilt. On the contrary, petitioner suggested that she sought help for her mother. Hr'g Tr., 25-26, Feb. 6, 2018; Appellant App. 12, 14-15. Given the minimal effect on the jury's verdict, it was harmless error.

Additionally, the petitioner's single earring matching the one found at the murder scene and bloody clothing seized in 2005 were in plain view, their incriminating nature was readily apparent, and the police were in a lawful position to observe these items. Accordingly, the court was well within its discretion to deny suppression of this evidence. *See Horton v. California,* 496 U.S. 128, 136-137 (1990); *United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir. March 13, 1979), *cert. denied*, 444 U.S. 955 (1979), *and r'hrg denied*, 444 U.S. 1027 (1980).

Accordingly, petitioner's claim is without merit and otherwise constitutes harmless error.

## POINT THREE

**PETITIONER FAILED TO EXHAUST REMEDIES IN STATE COURT PRIOR TO SEEKING FEDERAL HABEAS RELIEF; ADDITIONALLY, THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT THE CONVICTION.**

Petitioner argues that the evidence was legally insufficient to support the conviction. Petitioner's claim is procedurally barred and without merit.

A petitioner must exhaust the remedies in state court before seeking habeas relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A procedural default occurs when the state prisoner fails to exhaust her state remedies and is precluded from presenting her unexhausted claim by a state procedural rule. *See Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014), *cert. denied sub nom.*, *Jackson v. Artus*, 575 U.S. 919 (2015).

While petitioner did not present her legal sufficiency claim on appeal in state court, and consequently failed to exhaust her state remedies, she is now procedurally barred from raising the claim in state court. Petitioner may neither apply for leave to the Court of Appeals nor seek collateral review. *See*

N.Y.Crim.Proc.Law § 440.10(2)(a); N.Y. Court Rules § 500.20(a)(2); *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991).

Petitioner has also failed to show good cause for the procedural default and that she will be prejudiced if the federal court does not review the claim, or in the alternative, that a fundamental miscarriage of justice will result from non-review of the claim. *See Murray v. Carrier*, 477 U.S. 478, 492-496 (1986). Accordingly, petitioner is procedurally barred from federal habeas review of the legal sufficiency claim.

In addition, a federal court may not grant a writ of habeas corpus to a state prisoner unless it concludes that the state court rendered a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 399 (2000)(quoting 28 U.S.C. § 2254(d)(1)). The state court's factual findings are deemed correct unless the petitioner rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the Fourteenth Amendment, due process requires that a criminal conviction rest upon sufficient proof. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In challenging the legal sufficiency of her state court conviction, petitioner bears a "very heavy burden" to prevail on the habeas petition. *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002)(quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

In particular, the petition must be denied if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. An assessment of the weight of the evidence or the credibility of witnesses is left to the jury. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

As part of the legal sufficiency analysis, a habeas court must first look to state law to determine the elements for each crime. *See Ponnapula*, 297 F.3d at 179. Under New York law, a person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person, [s]he causes the death of such person." N.Y. Penal Law § 125.25(1)(McKinney 2019).

Viewing the evidence in the light most favorable to the People, the testimony and evidence at trial established the elements for the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. at 316. When Police Officer Sharon Acker responded to the murder scene on August 4, 2005, petitioner's mother, Lateyfa Lewis, was found stabbed to death on the bedroom floor. At about noon that day, petitioner told Officer Acker that she hugged and shook her mother to try to wake her up. While speaking with petitioner at the murder scene, Officer Acker noticed that she had one earring and was covered with blood on the front and back of her shirt, shorts, and knees. Petitioner also denied any signs of a robbery. Trial Tr., vol. 4, 438-439, 441-444, Sept. 12, 2018.

Detectives canvassed the scene and also found no signs of forced entry. But, there appeared to be a struggle and a fight in the bedroom. In particular, petitioner's matching earring was recovered between the victim's legs at the murder scene. The earring was bent with dry red staining on it. Trial Tr., vol. 5, 574, Sept. 13, 2018; Trial Tr., vol. 6, 740, 756-757, Sept. 14, 2018. Later that day, at about 4 p.m., John Ange, Esq. told Det. James Lonergan that he represented defendant. Hr'g Tr., 39-40, Feb. 6, 2018; Appellant App. 160.

17

In addition, petitioner's intent was made clear by her repeated confessions to four individuals. A few weeks after the murder, she admitted to her childhood friend, Ramona Wallace, that she had gotten into an altercation with her mother and stabbed her to death. Trial Tr., vol. 4, 24-29, Sept. 12, 2018. During visits with Tracy Argentieri the following year, petitioner paced back and forth in her basement while stating, "mom, I'm sorry for what I did" or "what I am doing" and throwing her hands in the air. Trial Tr., vol. 5, 682-683, Sept. 13, 2018.

Over 12 years later, while incarcerated at the Erie County Holding Center in early 2018, petitioner admitted to fellow inmate, Rayna Kelly, that she lost control and killed her mother. A few months after that, petitioner admitted to another inmate, Delecia Smith, that she had gotten into an argument with her mother before it had escalated. While petitioner did not tell Smith that she had killed her mother, she expressed concern over the blood evidence. Additionally, they were the only two people in the house at the time of her mother's killing. Trial Tr., vol. 5, 631-633, 664, 667-669, Sept. 13, 2018. Indeed, petitioner acknowledged that the testimony from her fellow inmates "connected petitioner to the offense." Pet'r's Supporting Facts 12.

While petitioner initially claimed that she shook and hugged her mother to try to wake her up, Officer Acker found it suspicious that petitioner had blood droplets on the back of her shirt since the deceased would not have been able to hug her. Trial Tr., vol. 4, 443, 445-447, Sept. 12, 2018.

Craig Moore, a 30 year veteran of the Niagara Regional Police Force, had processed about 2,500 crime scenes during his 16 years with the forensic unit. During that time, Moore received training and had analyzed bloodstain pattern analysis in over one hundred crime scenes. Through further training following his retirement, he became certified as a bloodstain pattern examiner and taught bloodstain pattern analysis through his company, Seymour Forensics. Trial Tr., vol. 6, 788-795, 800, 804, Sept. 14, 2018.

According to Moore, petitioner's shirt was facing a blood source when it received impact energy, which caused blood droplets to fly through the air and land on the shirt. Additionally, a castoff pattern was formed by a swinging motion of a bloodied object. Trial Tr., vol. 6, 825-830, Sept. 14, 2018. According to the mailman, he did not see petitioner touch her mother at the murder scene. Trial Tr., vol. 4, 500-501, Sept. 12, 2018. Thus,

the castoff patterns indicated that the blood got onto petitioner's clothing as she committed the murder.

When viewed as a whole and in the light most favorable to the prosecution, a rational jury could have found that the petitioner's conviction was supported by compelling evidence. *See generally United States v. Khan*, 53 F.3d 507, 513 (2d Cir. 1995)(evidence reviewed as a whole), *cert. denied*, 516 U.S. 1042 (1996).

Therefore, to the extent that petitioner's argument is not legally barred, it is without merit.

## POINT FOUR

**BASED ON THE RELEVANCE AND RELIABILITY OF THE EXPERT'S TESTIMONY, PETITIONER HAS FAILED TO ESTABLISH A DUE PROCESS CLAIM BASED ON THE COURT'S DENIAL OF A *FRYE* HEARING.**

Petitioner asserts that she was deprived of her due process rights based on the court's denial of a *Frye* hearing prior to the testimony of a blood spatter analysis expert. Her claim is without merit.

Under Federal Rule of Evidence 702(a), "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Furthermore, "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive [Frye] standard." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citing *Frye v. United*

*States*, 293 F.1013, 1014 (D.C. Cir. 1923)); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).

Instead, the party proffering an expert must prove by the preponderance of the evidence that its expert witness satisfies the *Daubert* criteria for relevance and reliability. *See Junger v. Singh*, 514 F.Supp.3d 579, 589 (W.D.N.Y. Jan. 22, 2021). "Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Id.* (quoting *Washington v. Kellwood Co.*, 105 F. Supp.3d 293, 304 (S.D.N.Y. 2015)).

Disputes as to the expert's qualifications, methodology, or lack of authority goes to the weight, not the admissibility, of the expert's testimony. *See Id.* "As the Second Circuit has noted, district courts should presume expert evidence is reliable." *Id.* (quoting *UMG Recordings, Inc. V. Lindor*, 531 F.Supp.2d 453, 456 (E.D.N.Y. 2007)).

Here, Craig Moore met the reliability standard under *Daubert* to testify as an expert on the blood splatter evidence.

His experience included 30 years with the Niagara Regional Police Force, more than half of that time with the Forensics Unit. While with the unit, he shadowed a senior officer for about six months, and ultimately processed 2,500 crime scenes. Trial Tr., vol. 6, 788-790, Sept. 14, 2018.

As part of his training, Moore took courses in collecting evidence with the Ontario Police College. He has a bachelors degree in criminal justice and a two year diploma in law and security policing. He was initially trained in blood splatter analysis at the Center of Forensic Sciences followed by additional training with criminalists in Corning, New York, Carlton University, conferences, and workshops. Moore also took part in a 14 month mentorship program with police officers and biologists. During the program, he was required to read articles and write papers, which culminated in an oral review. In all, he has conducted bloodstain pattern analysis in over 100 crime scenes. Trial Tr., vol. 6, 788-794, Sept. 14, 2018.

In addition, Moore is certified as a bloodstain pattern examiner. He has also taught college level courses in forensics, conducted research on bloodstain pattern with Iowa State

University, and received two patents in bloodstain pattern analysis. Trial Tr., vol. 6, 800-803, Sept. 14, 2018.

Furthermore, Moore explained his methodology of analyzing a crime scene for bloodstain patterns, including observations, measurements with specific tools and computer software, and experimentation, if necessary, before drawing his conclusions. Trial Tr., vol. 6, 795-797, 803-804, Sept. 14, 2018. In addition to testifying on bloodstain analysis in 23 cases, Moore runs his own company as a private instructor on bloodstain pattern analysis. Trial Tr., vol. 6, 804, Sept. 14, 2018.

Lastly, the expert's testimony was relevant as to the castoff staining found on the back of petitioner's shirt, which indicated that something was swung through the air. Trial Tr., vol. 6, 847-849, Sept. 14, 2018.

Given these facts, there was sufficient reliability in the expert's testimony. Therefore, petitioner has failed to establish a due process claim based on the trial court's denial of a *Frye* hearing.

## CONCLUSION

Based on the lack of any merit to petitioner's claims, respondent respectfully requests that the petition be dismissed its entirety.


DATED:     Buffalo, New York
           January 22, 2024

                              Respectfully submitted,

                              JOHN J. FLYNN
                              DISTRICT ATTORNEY

                    By:       _____
                              JERRY MARTI
                              Assistant District Attorney
                              Erie County District
                               Attorney's Office
                              25 Delaware Avenue
                              Buffalo, New York 14202
                              (716)858-2447
                              jerry.marti@erie.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LASHAWN LEWIS, 18-G-1036,

                    Petitioner,

            v

EILEEN RUSSELL,

                    Respondent.

AFFIDAVIT
OF SERVICE

23-CV-06567-DGL

---

STATE OF NEW YORK )
COUNTY OF ERIE    )    §:
CITY OF BUFFALO   )

KRISTY DULAK, being duly sworn, deposes and says:

That she is over the age of twenty-one (21) years and is employed by the County of Erie at the Erie County District Attorney's Office; that on January 22, 2024, she served the within Memorandum of Law upon Lashawn Lewis, Petitioner, addressed to Lashawn Lewis, #18-G-1036, at her last known address c/o Bedford Hills Correctional Facility, 247 Harris Road, Bedford Hills, New York 10507-2400, by depositing a true copy of same, securely enclosed in a postpaid wrapper, in a post office box regularly maintained by the United States Postal Service at the Erie County Hall in the City of Buffalo, New York in the above-captioned matter.

                              _____
                              KRISTY DULAK

Subscribed and sworn to before
me on January 22, 2024

_____
ELAINE J. WILLIAMS
Notary Public, State of New York
Qualified in Erie County
My Commission Expires September 4, 2025.