# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

LaSHAWN LEWIS,

        Petitioner,

   -v-

EILEEN RUSSELL, SUPERINTENDENT of
BEDFORD HILLS CORRECTIONAL FACILITY,
        Respondent.

**23-CV-06567-DGL**

---

---

Petitioner's
REPLY

---

LaShawn Lewis, Petitioner *pro se*
18G1036
Bedford Hills Correctional Facility
247 Harris Rd
Bedford Hills, NY 10507

## PRELIMINARY STATEMENT

Petitioner LaShawn Lewis respectfully reiterates all statements of fact and issues raised in her previously-filed petition, with the exception to Ground Three, which the Respondent asserts the Petitioner failed to exhaust in state court.

She is requesting to amend her petition and dismiss the unexhausted claim (Ground Three). A stay and abeyance is not available; the direct appeal has already been heard in this matter and no other state court options exist relating to that claim.

She further asks this Court to consider the arguments set forth below relative to these issues as a reply to Respondent's answer.

## ARGUMENT

**Ground One:** <u>Negligence does not Excuse a Twelve-Year Delay in Prosecution.</u>

The twelve-year delay in prosecution caused petitioner undeniable harm because the lapse in time meant exculpatory evidence and investigative leads were lost. Considering the dearth of proof and the fact that the first jury deadlocked, the availability of this evidence probably would have brought a different result. The absence of such due to this delay severely prejudiced the petitioner's due process rights, and so the conviction should be reversed.

In reviewing the legitimacy of delays, the Supreme Court established four relevant propositions:

**1. This is a routine prosecution; 2. After the Government assembled all of the evidence on which it expects to establish petitioner's guilt, it waited almost 18 months to seek an indictment; 3. The delay was prejudicial to petitioner's defense; and 4. No reason whatsoever explains the delay. (US v Lovasco, 431 US 783)**

Applying these propositions to the petitioner's case:

1. This is a routine prosecution; 2. After the prosecution had all its evidence in 2005, it waited until 2017 to indict the defendant; 3. The delay was prejudicial, costing the petitioner access to exculpatory evidence and witnesses; and 4. There is no valid reason that explains the delay. The prosecution was aware of the relevant facts more than 12 *years* before the indictment.

The Respondent claims the twelve-year delay was miscommunication between detectives (See Answer for Respondent at p. 6). The Respondent will have you believe that the lead detective, Mark Lauber, did not have any knowledge or notification of Ramona Wallace's statement until May 2018.

In reality, the facts and sworn testimony of Det Mark Lauber, himself, shows he admitted to making a note to interview Ramona Wallace on Sept. 10, 2005— nearly 13 years earlier (Addendum A at p. 2). The detective failed to do so, a clear violation of petitioner's due process rights. In fact, there were also two cold case

detectives who saw the statement in the file, not to mention ADA Colleen Curtin Gable, who was assigned to the case multiple times.

Decade-plus delays in prosecution deserve close scrutiny by the court because of the very real risk of prejudice to the accused. Here, both the Buffalo Police Department and the Erie County District Attorney's Office admit mistakes were made and a twelve-year delay could be detrimental to a defendant (Addendum A at p. 2-3). The malfunctions within the prosecution were critically harmful to the petitioner's defense, being that a suspect died in the meantime (Tr at 492). Had this case been timely prosecuted, the defense could have determined whether that suspect was a match to the still-unknown male DNA profile. In addition, live video footage of the petitioner's whereabouts could have been retrieved to prove that the petitioner was not at the crime scene when the murder took place. Defense counsel was not able to investigate at all, directly due to the prosecution's delay. Had the delay not occurred, the above-mentioned would have been accessible and used as evidence. The negligence and miscommunication absolutely prevented the petitioner from being able to present a viable defense.

The prosecution consisted of the District Attorney and the Buffalo Police Department—acting as an arm of the prosecution—who were well aware of the Ramona Wallace statement. Multiple detectives testified in the *Singer* hearing to seeing, reviewing, and signing off on the statement, so feigning ignorance of this

3

statement, which became critical to the decision to prosecute the petitioner over 12 years later, is not truthful. Furthermore, law enforcement's malfunctions in staffing and failures to follow up or understand evidence are unreasonable and inexcusable justifications for such a delay.

To clarify how DNA evidence could have exonerated the petitioner, there were unknown *male* DNA profiles at the scene of the crime, where the petitioner's female DNA was not. (Petitioner's DNA was only found in a trash bag, in the basement, two floors below, where no other evidence relating to the crime was found.) Regarding the blood spatter, the Respondent critically omitted the fact that a witness saw the petitioner throwing her arms into the air after unsuccessful attempts to revive the victim, her mother (Tr at 844-845). Respondent also omits the fact that this witness had to pry the grieving petitioner off of her mother when the EMTs arrived (Tr at 534). The People's "expert" conceded that the blood on the Petitioner's shirt could have come from hugging her mother and flinging her arms in the air from grief (Tr at 843-845). In addition, in the People's brief on direct appeal, they admit "that the blood could have gotten on the defendant either by trying to revive the victim or from committing the crime." (People's Brief- p. 15)

After such a long and unnecessary delay, there was no way for the defense to canvass the area to potentially get information on the actual murderer. There was no way to thoroughly investigate to find the missing knife handle, which was critical

due to the prosecution's theory that the petitioner spontaneously committed the crime and never left the scene. The People's story is not plausible. Without the ability to present a defense the conviction was a result of a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Contrary to the People's assertion, these facts *were* before the court when defense counsel renewed the *Singer* argument in both trials, as well as on direct appeal.

This case demonstrates the intense prejudice caused to the defense by the undue delay in prosecution. Therefore, the Due Process claim and relief should be granted and the indictment dismissed, as the State's factual determination is not fairly supported by the record.

**Ground Two:** <u>Violation of Indelible Right to Counsel was Not Harmless Error</u>

It bears repeating: the passage of time does not fade an executed right to counsel.

The authority of an attorney and the attorney-client relationship begins with his retainer and lasts until the matter for which he was retained is completed.

Petitioner's right to counsel, enshrined in the Sixth Amendment, attached August 4, 2005 while petitioner was under interrogation on the date of her mother's murder. John Ange, Esq, was retained to represent her. He immediately notified

Buffalo Police Headquarters, asserted her right to remain silent, and requested that all questioning stop. Even after being notified that counsel was retained, the BPD continued to question the petitioner, had her sign statements, and seized clothing, absent the presence of her attorney—without ever telling her that an attorney was retained for her.

In 2005, upon being notified that an attorney had entered the proceedings and knowing that petitioner was represented, by law, the police should have ceased all questioning and had petitioner sign a waiver and consent to search form in the presence of defense counsel. This clearly violated the petitioner's Sixth Amendment right.

Fast-forwarding to the 2017 interrogation, the Respondent asserts that in 2017, after contacting the initially retained counsel, John Ange, Esq, they determined that the attorney-client relationship had terminated, due to lapse in time. However, an attorney-client relationship remains valid until the purpose for which it was formed no longer exists. The mere passage of time does not negate the relationship, especially considering that the twelve-year delay was solely attributable to the People. Here, the attorney was retained in 2005 to represent the petitioner, as she was a suspect in her mother's murder. In 2017, this matter was still pending and had been revived by the police. At no intervening point did the petitioner release her

attorney from this matter. Therefore, despite the time lapse, the petitioner was still protected by her asserted right to counsel.

The Sixth Amendment right to counsel does not come with an asterisk, allowing time to dissolve an attorney-client relationship, as the Respondent thinks. And rightly so—this would provide an undue benefit to the prosecution and incentivize delaying initiated prosecutions. This is not what the Constitution stands for. Instead, this exercised right to counsel barred the police investigators from initiating a meeting, even in 2017, even when counsel had been retained in 2005 for this case, and then neither the attorney nor the petitioner ever withdrew from the relationship. Therefore, in 2017, petitioner was still represented by counsel for this matter.

"Once an accused person had retained counsel, she should not be subjected to further interrogation by the authorities until counsel has been under available to him, unless the accused himself initiates further communication." Edwards v Arizona, 451 US 477. Although the petitioner signed the *Miranda* waiver, she was not aware of her Constitutional rights that allow her to reconnect with the initially-retained attorney, and the police said nothing to her about her ongoing representation. Therefore, the petitioner could not have "knowingly and intelligently" waived her Sixth Amendment right to counsel, without her counsel's presence. It was wrong of the police to even communicate with the petitioner directly because she had counsel.

Knowing the petitioner had retained counsel for this matter—regardless that said counsel was hired years earlier—the People had an obligation to offer the petitioner an opportunity to contact that attorney, rather than downplaying the significance of signing the *Miranda* waiver card by suggesting "it's no big deal," when in fact it was a critical point in the proceeding. For the same reason, police violated petitioner's rights when they took the buccal swab outside of counsel's presence.

The statement and clothing taken in 2005 should have been inadmissible where counsel had been retained and ordered the BPD to cease all matters with the petitioner. This violated the petitioner's right to counsel. Nor should the 2017 interrogation have been admissible when counsel from 2005 still attached. There errors were not harmless. The clothing was used against the petitioner, and the 2017 interrogation made up over half of the People's case in both trials in 2018. Both of these pieces of evidence deeply influenced the jury's verdict. To the extent that the Respondent admits that the two statements were taken after counsel attached (see Answer pg. 12), which should be a concession that the petitioner's rights were violated.

Because the prosecution and police repeatedly disregarded the petitioner's Sixth Amendment right to counsel, both in 2005 and in 2017, this Court should reverse the conviction.

**Ground Three:** *Amended- Petitioner requests this ground to be dismissed as unpreserved.*

**Ground Four:** The Reliability of the Expert's Testimony was Not Scientifically Valid and Not Trustworthy.

The Respondent bases the qualification and testimony provided by the State's expert witness on the *Daubert* criteria. However, even if the expert's previous experience qualifies them, each case and the evidence surrounding will vary to some degree.

In the petitioner's case, the expert submitted his report weeks after the crime occurred in 2005, after only reviewing a few photos that were not measured. No other specific testing or measurements were conducted. At that point, the expert was not aware of the petitioner's reaction to finding the victim, which prevented him from giving an opinion based on all the facts.

Twelve years later, at both of the petitioner's trials, the expert, upon hearing the People's witnesses, admitted that the blood on the petitioner could indeed have come from her movements trying to revive the victim. This is a concession that the expert's initial determination of guilt was speculative and not supported by the evidence.

Furthermore, the National Academy of Sciences has called the validity of blood spatter theories into question. More importantly, the expert had no idea about the error rate of his studies, which is something that should be known, according to the *Daubert* criteria. He presented nothing to support his conclusions. Most noteworthy is the admittance from the expert based on his experience that the petitioner could have been attempting to save the victim's life, a fact that the Respondent omits from the answer.

The denial of a *Frye* hearing constituted that blood spatter testimony is viewed the same today as it was decades ago. This is contrary to what *Frye* actually stands for. It was of crucial importance to examine the growing fundamental errors associated with blood spatter testimony.

Aside from the lack of consensus on the issue, the uncertainties of both the blood spatter, and the expert's inability to give an accurate analysis, the request for the *Frye* hearing should have been granted and had it been granted, this speculative blood spatter evidence and expert opinions would likely have been suppressed. Because that did not happen, the testimony allowed in was unfair and prejudicial. The petitioner's Due Process has been violated, and reversal is appropriate.

**Conclusion:** As Petitioner demonstrates constitutional violations, she requests the conviction to be reversed.

# AFFIDAVIT OF SERVICE

I, LaShawn Lewis, do swear under penalty of perjury, pursuant to 28 USCA §1746, that I am the petitioner in this proceeding, and I do swear that I have on this 15th day of February 2024 duly mailed via first class US Postal Service, by depositing in the facility mail bag and designated as legal mail, the following documents: her Reply Petition and this Affidavit of Service to the following parties:

US District Court- Western District
2120 US Courthouse
100 State St
Rochester, NY 14614

      (*original and two copies*)

Erie County DA
Jerry Marti, Assistant District Attorney
25 Delaware Ave
Buffalo, NY 14202

      *(copy)*

Respectfully,

LaShawn Lewis 18G1036, Petitioner *Pro Se*
Bedford Hills Correctional Facility
247 Harris Rd
Bedford Hills, NY 10507