UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LASHAWN LEWIS,

                                  Petitioner,                    DECISION AND ORDER

-vs-

                                                                 23-CV-06567-MAV
EILEEN RUSSELL,

                                  Respondent.

---

## INTRODUCTION

*Pro se* petitioner, Lashawn Lewis ("Petitioner"), filed a petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of her
conviction for murder in the second degree under New York Penal Law § 125.25(1),
which followed a jury trial in New York State Supreme Court, Erie County.
Appellant's Appendix ("AA") at 5–6; ECF No. 1. Petitioner was sentenced to an
indeterminate prison term of 25 years to life and is currently incarcerated at Bedford
Hills Correctional Facility.

Petitioner asserts the following grounds for relief in her petition: (1) a 12-year
delay between commission of the crime and indictment violated her due process
rights; (2) certain evidence and statements should have been suppressed due to a
violation of her indelible right to counsel; (3) the evidence presented at trial was
legally insufficient to support the conviction; and (4) the trial court erred in denying
her request for a *Frye* hearing with respect to the admissibility of expert testimony

1

about bloodstain pattern analysis. ECF No. 1 at 7–8, 11–26.[1] For the reasons discussed below, Petitioner's habeas corpus petition is denied.

## PROCEDURAL HISTORY

### I. Background

On August 4, 2005, Lateyfa Lewis ("the victim") — Petitioner's mother — was found stabbed to death inside of her house in Buffalo, New York. Trial Tr. ("Tr."), Sept. 10–19, 2018, at 438–39, 441–42. When the Buffalo Police Department ("BPD") responded to the house that morning, they found the victim lying deceased on the floor with multiple stab wounds. *Id.* at 441–42. The police encountered Petitioner at the house and observed bloodstains on her clothing. *Id.* After a brief conversation with police, Petitioner was transported to the police station where she provided officers with a written statement and her blood-stained clothing. *Id.* at 546–48, 757–58. The police received a phone call and a letter from Petitioner's attorney, John Ange, in the afternoon of August 4, 2005, requesting that all questioning stop until he was present. AA at 160.

Over 12 years later, on October 12, 2017, the police again interviewed Petitioner concerning the homicide. Tr. at 865. Prior to the interview, the police confirmed with Petitioner and Ange that Ange no longer represented Petitioner in connection with the victim's death. *Huntley* Hearing Tr. ("HH Tr."), Feb. 6, 2018, at 43–45, 68–69. Petitioner waived her *Miranda* rights and agreed to provide a

---

[1] The page references are to the consecutively paginated PDF generated by the Court's CM/ECF electronic filing system as opposed to the separately titled and paginated documents within the PDF.

statement and a DNA buccal sample. Tr. at 868.

On November 2, 2017, Petitioner was charged by indictment with one count of murder in the second degree for intentionally causing the victim's death. AA at 1, 8–9. Petitioner was arrested on November 7, 2017. Tr. 856–57.

## II. *Singer* Hearing and Decision

On May 21, 2018, the trial court held a *Singer* hearing to assess whether Petitioner's due process rights were violated by the 12-year delay between commission of the crime and indictment. At the hearing, the court heard testimony from members of the BPD and the Erie County District Attorney's Office ("DA's Office"), regarding the investigation over the 12-year period. *Singer* Hearing Transcript ("SH"), at 2–3, May 21, 2018.

BPD officers testified that their investigation commenced on August 4, 2005, at approximately 11:42 a.m., when they responded to a reported stabbing at 97 Orange Street in Buffalo, New York. *Id.* at 6. The officers found the victim deceased on the second floor of the house with blood all over the room. *Id.* at 6–7, 29. The officers encountered Petitioner at the scene who had a large amount of dried blood on her and blood droplets on the back of her shirt *Id.* at 9, 26, 56.

Attorneys with the DA's Office testified that while Petitioner was a suspect in the victim's homicide beginning in 2005, there was insufficient evidence to bring an indictment, as the evidence was purely circumstantial. *Id.* at 98, 103–05. For example, the BPD found an elephant-shaped earring on the floor near the victim and observed Petitioner wearing a similar earring, but in only one ear, suggesting that a

3

struggle occurred between the victim and Petitioner. *Id.* at 98. Additionally, the BPD observed suspicious bloodstain patterns on the victim's clothing. *Id.* at 99–100. However, there were no admissions or eyewitnesses to the homicide. *Id.* at 99. The homicide remained open following the initial investigation. *Id.* at 105.

In 2009, the DA's investigation was assigned to Colleen Curtin Gable. *Id.* at 114–15, 121–22. Gable began reviewing the homicide file maintained by the DA's Office, which remained unchanged since 2005 and included various police reports, statements, evidence lists, forensic reports, and photographs. *Id.* at 122–23. On June 17, 2009, Gable met with a BPD detective to discuss recent DNA testing, which identified previously unknown male DNA profiles at the crime scene as the victim's husband and Petitioner's son. *Id.* at 125–28. However, there remained unknown male DNA at the scene. *Id.* at 128. The DA's Office determined that there was insufficient evidence to file formal charges in 2009. *Id.* at 129.

On April 18, 2016, BPD detectives requested to meet with Gable to discuss the investigation. *Id.* at 130. The detectives brought the BPD homicide file to the meeting, which Gable had not previously reviewed. *Id.* at 131. During her review of the BPD homicide file, she noticed a written statement from Ramona Wallace, who was Petitioner's friend, dated December 13, 2005, in which Wallace claims that Petitioner admitted to committing the victim's murder. *Id.* at 132; Conditional Exam Tr., dated Sept. 6, 2018, at 25. Gable had not seen Wallace's statement before. *Id.* at 131. In fact, none of the attorneys within the DA's Office who testified at the *Singer* hearing knew of the statement prior to April 18, 2016, as it was not in the DA's homicide file.

4

*Id.* at 101–02, 123, 170.[2]

Absent Wallace's statement, the DA's Office did not believe there was sufficient evidence to proceed with an indictment. *Id.* at 137. However, with Wallace's statement, the case went from purely circumstantial to circumstantial plus an admission, which, according to the DA's Office, completely changed the dynamic of the case and significantly impacted the decision to prosecute. *Id.* at 106–07, 110, 137–38.

Following the *Singer* hearing, the trial court issued a decision finding that the 12-year pre-indictment delay did not violate Petitioner's due process rights. AA at 123–27. The trial court evaluated the purported due process violation pursuant to the factors set forth in *People v. Taranovich*, 37 N.Y.2d 442, 445 (1975), which are: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether there has been an extended period of pretrial incarceration; and (5) whether there is any indication that the defense has been impaired by reason of the delay. *Id.* at 124–25. In weighing these factors, the trial court found that the length of delay and the reason for the delay, which tended to favor Petitioner, were outweighed by the seriousness of the offense and lack of any articulated prejudice. *Id.*

Specifically, as to the reason for the delay, the trial court found that a crucial piece of evidence and catalyst for the indictment—the statement of Ramona Wallace from December 13, 2005—was mishandled by detectives in the BPD Homicide Unit.

---

[2] The DA's homicide file is separate from the BPD's homicide file, and they do not necessarily contain the same information. SH Tr. at 95-96. For information to be included in the DA's homicide file, an officer would have to provide it to the DA's Office since the DA's Office does not have direct access to the files of the BPD. *Id.* at 95-96.

*Id.* at 125. Although the BPD's mishandling of an important piece of evidence was "not acceptable," according to the trial court, the court ultimately found there was no evidence that the failure to transmit this evidence was a deliberate attempt to delay or impair the defense or was an attempt to gain some tactical advantage. *Id.*

As to whether the defense was impaired by the delay, the court found a lack of prejudice inasmuch as there was no indication that an alibi witness was no longer available or that the passage of time damaged Petitioner's ability to raise some other defense. *Id.* at 126.

### III. Trial, Verdict, and Sentence

Petitioner's first trial, which occurred between May 29, 2018, and June 7, 2018, ended in a mistrial. At the second trial beginning on September 10, 2018, BPD officer, Sharon Acker, testified that she responded to a reported stabbing on August 4, 2005, at around 11:52 a.m., inside of a house located at 97 Orange Street, Buffalo, New York. Tr. 438–39. Officers did not notice any signs of forced entry. Tr. at 449–50, 452, 573–74, 740, 747.

Acker entered the house and found the victim deceased in a second-floor bedroom. *Id.* at 441. The victim was lying on the floor, face up, with multiple stab wounds. *Id.* at 442. The victim was not actively bleeding at the time. *Id.* In total, the victim suffered fifty-four stab wounds and had defensive wounds on her hands. *Id.* at 782, 784.

Acker also observed Petitioner standing in the bedroom. *Id.* at 441. Petitioner had blood on the front and back of her shirt, shorts, and on her knees. *Id.* at 444.

Petitioner told Acker that she arrived at the victim's house at approximately 8:30 a.m. but was told by the victim to come back later. *Id.* at 443. Petitioner stated that she returned later that day at approximately 11:30 a.m. and used the victim's keys to enter the house,[3] where she found the victim deceased on the floor. *Id.* at 443–44. Petitioner stated that she hugged the victim and shook her in an attempt to wake her. *Id.* at 443.

BPD detective, Mark Lauber, testified that he observed Chefmate knives in the kitchen drawers of the house. *Id.* at 776. These knives were significant, according to Lauber, because the knife found with the victim had a Chefmate imprint. *Id.* The Chefmate knife that was found in the bedroom with the victim was broken into pieces, with the tip of the knife still in the victim and two other pieces underneath the victim. *Id.* at 781–82.

BPD Officer, Patrick Murphy, collected an elephant–shaped earring from the floor between the victim's legs; the wire hook on the earring was damaged such that it was "more or less straight." *Id.* at 591, 599, 606. Petitioner was observed wearing a matching earring on the day of the homicide, but only in one ear. *Id.* at 598. The earring obtained from Petitioner was intact with a bent wire such that it would hold in a person's ear. *Id.* at 601.

---

[3] Anthony Lewis, the victim's husband, testified that he and the victim were the only individuals who lived at 97 Orange Street, and that they were the only two who owned keys to the house. *Id.* at 468, 470, 474. The victim's car key and house keys were on the same keychain *Id.* at 473–74. On the day of the homicide, when Lewis left for work at 4:30 a.m., the victim was sleeping, but still alive *Id.* at 471.

Craig Moore, an expert on bloodstain pattern analysis, reviewed the bloodstain patterns on the front of the shirt worn by Petitioner on the day of the homicide and testified that the small droplets of blood formed an impact pattern, which was caused by droplets of blood traveling through the air and striking the shirt. *Id.* at 804, 809–10, 824–28, 847. Moore opined that the front of Petitioner's shirt was facing the blood source when it received the impact energy. *Id.* at 829–30. Moore also opined that the castoff pattern on the back of Petitioner's shirt was created by an up and down swinging motion of a bloodied object or, in other words, "something wet with blood swung through the air." *Id.* at 830; *see also id.* 848–49.[4]

The prosecution presented the jury with a video recording of Ramona Wallace's conditional exam testimony, which was taken on September 6, 2018. *Id.* at 562–65.[5] Wallace testified to having known Petitioner since childhood and considered her a friend. CE Tr. at 23–25. Petitioner visited Wallace's house in late August 2005 at some time after the victim's death to purchase crack cocaine from Wallace's son; according to Wallace, she appeared fidgety and nervous. *Id.* at 26–27, 41. After Petitioner used the drugs, Wallace asked her why she was nervous and fidgety and

---

[4] During jury selection, defense counsel requested a *Frye* hearing to assess whether it was proper for Moore to provide bloodstain pattern analysis expert testimony. Tr. 230–39. The trial court ultimately denied defense counsel's request, *id.* 323, and the Appellate Division affirmed, relying on *People v. Barnes*, 267 A.D.2d 1020, 1021 (4th Dep't 1999), *lv denied* 95 N.Y.2d 832 (2000), which held that the trial court had not abused its discretion in denying the defendant's request for a *Frye* hearing with respect to the admissibility of evidence of blood spatter interpretation inasmuch as such evidence has long been deemed reliable.199 A.D. 3d at 1442.

[5] The trial court granted the prosecution's request for a conditional exam because Wallace was going to be out of the country for an indeterminate period beginning on September 8, 2018, and the court wished to proceed with the trial expeditiously. Conditional Exam Tr ("CE Tr."), dated Sept. 6, 2018, at 3–4.

Petitioner responded that she and the victim got into an altercation over money, resulting in Petitioner stabbing and killing her. *Id.* at 27–29.

The jury also heard testimony from Rayna Kelly who stated that while incarcerated at the Erie County Holding Center in February 2018, she met Petitioner, and they had a conversation during which Petitioner admitted to losing control while high on drugs and killing the victim. Tr. at 631–33.

Tracy Argentieri testified that Petitioner would come over to her house a few times a week after the victim's death and pace back and forth in her basement, swinging her arms up and down, saying, "mom, I'm sorry for what I did." *Id.* at 682–84, 689. Argentieri observed this behavior well over a hundred times. *Id.* at 689.

Petitioner was found guilty of murder in the second degree and sentenced to a prison term of 25 years to life. *Id.* at 1107; Sentencing Tr., Nov. 8, 2018, at 8; AA at 5.

### IV. Direct Appeal and Federal Habeas Petition

Petitioner pursued a direct appeal of her conviction, arguing through counsel, as relevant here: (1) the 12-year delay between commission of the crime and indictment violated her due process rights; (2) the trial court erred in denying her request for a *Frye* hearing regarding the admissibility of expert bloodstain pattern testimony; (3) the verdict was against the weight of the evidence; and (4) Petitioner's indelible right to counsel was violated and, therefore, certain evidence and statements should have been suppressed. App. Br. at 1–45. Petitioner filed a *pro se* appellate brief arguing, *inter alia*, that the pre-indictment delay violated her due

process rights, and the verdict was against the weight of the evidence. App. *Pro Se* Br. at 1–17.

On November 19, 2021, the New York State Supreme Court, Appellate Division Fourth Department ("Appellate Division"), affirmed the conviction. *People v. Lewis*, 199 A.D. 3d 1441, 1441 (4th Dep't 2021). In rejecting Petitioner's contention concerning the 12-year pre–indictment delay, the Appellate Division found, in light of the *Taranovich* factors, that the pre-indictment delay was attributable to the negligent mishandling of a crucial witness' statement by the police department as opposed to bad faith on the part of the prosecution. *Id.* at 1441–42. Additionally, the Appellate Division determined that the underlying charge was a serious offense, Petitioner was not incarcerated during the delay, and there was no indication that Petitioner's right to a fair trial was significantly impaired by the delay. *Id.* at 1442. The Appellate Division concluded that these factors outweighed the length of the delay. *Id.* at 1441.

The Appellate Division rejected Petitioner's contention regarding the violation of her indelible right to counsel, finding that although Petitioner's indelible right to counsel attached in 2005 when an attorney appeared in the case on her behalf, the prosecution properly established the attorney-client relationship had terminated prior to the questioning of Petitioner in 2017 and, therefore, Petitioner's indelible right to counsel had not been violated. *Id.* at 1442.

The Appellate Division rejected Petitioner's contention concerning the denial of her request for a *Frye* hearing, relying on *Barnes*, 267 A.D.2d at 1021, which held

10

that the trial court had not abused its discretion in denying the defendant's request for a *Frye* hearing on the admissibility of evidence of blood spatter interpretation inasmuch as such evidence has long been deemed reliable. 198 A.D.3d at 1442. The Appellate Division summarily rejected all of Petitioner's other contentions, including that the verdict was against the weight of the evidence. *Id.* at 1442–43.

The New York Court of Appeals denied Petitioner's application for leave to appeal, *People v. Lewis*, 38 N.Y.3d 1034 (2022) and, on October 3, 2022, the United States Supreme Court denied her petition for a writ of certiorari. *Lewis v. New York*, 143 S. Ct. 262 (2022).

Petitioner timely filed this petition for habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Respondent filed and served an answer and memorandum of law in opposition. ECF Nos. 7, 8. Petitioner filed a reply in which she withdrew her claim that the evidence was legally insufficient to support the conviction. ECF No. 11 at 2. Accordingly, the Court addresses the remaining contentions below.

## LEGAL STANDARD

"Federal habeas corpus law generally gives state courts the first opportunity to address state prisoners' claims that their custody violates federal law." *Chrysler v. Guiney*, 806 F.3d 104, 116–17 (2d Cir. 2015); *see Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014) (citing 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). A number of requirements and doctrines ensure the centrality of the state courts under federal habeas corpus law. *Jackson*, 763 F.3d at 132. "First, the exhaustion requirement ensures that state

11

prisoners present their constitutional claims to the state courts in the first instance." *Id.*; *see* 28 U.S.C. § 2254(b). Second, "[s]hould the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Jackson*, 763 F.3d at 132 (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)).

Lastly, if the state court denies a federal claim on the merits, federal courts are prohibited from granting habeas relief unless the state court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). *Englert v. Lowerre*, 115 F.4th 69, 80 (2d Cir. 2024).

For purposes of 28 U.S.C. § 2254(d)(1), "clearly established Federal law refers only to the holdings of the Supreme Court extant at the time of the relevant state court decision." *Jackson*, 763 F.3d at 134 (internal quotation marks and brackets omitted); *Rodriguez v. Miller*, 537 F.3d 102, 106–07 (2d Cir. 2008) (noting "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even the dicta of the Supreme Court can provide the basis for habeas relief" under the AEDPA).

"A state court decision is 'contrary to' clearly established federal law 'if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law' or the state court 'decides a case differently than [the Supreme]

Court has on a set of materially indistinguishable facts.'" *Englert*, 115 F.4th at 80 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). "A state court decision involves an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Englert*, 115 F.4th at 80 (quoting *Williams*, 529 U.S. at 413); *see Jackson*, 763 F.3d at 135 ("[A] state court's 'unreasonable' application of law is not synonymous with an 'incorrect' or 'erroneous' decision . . . [i]nstead, the state court's application must be 'objectively unreasonable.'").

Under 28 U.S.C. § 2254(d)(2), "[a] state court makes an 'unreasonable determination of the facts' only when 'reasonable minds could not disagree' that such a determination was error." *Ervine v. Smith*, No. 22-1165, 2024 WL 3219501, at *2 (2d Cir. June 28, 2024) (quoting *Cardoza v. Rock*, 731 F.3d 169, 177–78 (2d Cir. 2013)). "A 'state-court factual determination is not unreasonable,' however, 'merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Ervine*, 2024 WL 3219501, at *2 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

"[U]nder the AEDPA, the determinative question 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Englert*, 115 F.4th at 80 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "In other words, to obtain § 2254 relief, a petitioner must show 'that the state court's ruling on the

13

claim being presented in federal court was so lacking in justification that there was
an error well understood and comprehended in existing law beyond any possibility
for fairminded disagreement.'" *Englert*, 115 F.4th at 80 (quoting *Harrington v.
Richter*, 562 U.S. 86, 103 (2011)). "Thus, the existence of reasonable arguments on
both sides' is all the state needs to prevail in an AEDPA case." *Englert*, 115 F.4th at
81 (internal quotation marks and brackets omitted).

## DISCUSSION

Because Petitioner is proceeding on this petition *pro se*, the Court has
construed her submission liberally, "to raise the strongest arguments that they
suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nevertheless, after a
review of the papers of both parties, and the transcripts and records of the state court
proceedings, in accordance with Rule 8 of the Rules Governing Section 2254 Cases,
the Court finds that an evidentiary hearing is not necessary to address Petitioner's
arguments. *See also* 28 U.S.C. § 2254(e)(2).

### I. Pre-Indictment Delay

Petitioner contends that the state court unreasonably applied clearly
established federal law in finding that her due process rights were not violated by the
12-year pre-indictment delay caused by the prosecution's negligent handling of a
witness statement. ECF No. 1 at 7, 11, 13. According to Petitioner, this delay made it
impossible to present a defense inasmuch as certain DNA evidence degraded and any
alibi evidence no longer existed. ECF No. 1 at 12, 15.

Here, the "clearly established" federal law applicable to Petitioner's pre-

14

indictment delay claim is governed by *United States v. Marion*, 404 U.S. 307 (1971) and *United States v. Lovasco*, 431 U.S. 783 (1977). *See McFadden v. Graham*, No. 1:18-cv-00865, 2019 WL 4016160, at *5 (W.D.N.Y. Aug. 25, 2019) In *Marion*, the Court observed that although the "applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges," the statute of limitations does not fully define a defendant's rights under the Due Process Clause of the Fifth Amendment. *Marion*, 404 U.S. at 322–324 (internal quotation marks, citation, and ellipsis omitted).  In certain circumstances, the Due Process Clause may require dismissal of an indictment based on pre-indictment delay even where the prosecution was brought within the applicable limitations period. *See id.* The Supreme Court in *Marion* found no Due Process violation in connection with pre-indictment delay where "[n]o actual prejudice to the conduct of the defense is alleged or proved, and there [was] no showing that the Government intentionally delayed to gain some tactical advantage" over the defendant. *Id.* at 325.

In *Lovasco*, the Supreme Court explained that "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 796. The *Lovasco* court explained that in evaluating the reasons for the delay, a court's role is limited to determining whether "the action complained of . . . violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Id.* at 790 (internal quotations and

citations omitted). "The Supreme Court declined to set out a balancing test for determining when pre-indictment delay violates due process, instead leaving it 'to the lower courts, in the first instance, the task of applying settled principles of due process that [it] [has] discussed to the particular circumstances of individual cases.'" *McFadden*, 2019 WL 4016160, at *5 (quoting *Lovasco*, 431 U.S. at 797). *Lovasco* held that the defendant was not deprived of due process where they were prosecuted following an investigative delay even though their defense may have been somewhat prejudiced by the lapse of time. 431 U.S. at 796

As relevant here, "[t]he Supreme Court has never clearly held that negligent delay by the prosecution in bringing an indictment . . . would be sufficient to satisfy a test for a due process violation." *McFadden*, 2019 WL 4016160, at *6; *see also Symonds v. Griffin*, No. 15-cv-9423, 2024 WL 4044456, at *12 (S.D.N.Y. Sept. 4, 2024) ("Courts in this Circuit have ruled . . . that simple negligence does not provide a basis for a due process claim."). Thus, the Appellate Division's finding that a delay attributable to the negligent mishandling of a witness statement did not constitute a due process violation was neither contrary to, nor an unreasonable application of, Supreme Court precedent. *See Symonds*, 2024 WL 4044456, at *13; *McFadden*, 2019 WL 4016160, at *6.

Nor did the Appellate Division make a finding contrary to, or unreasonably apply, Supreme Court precedent in determining that Petitioner had not demonstrated actual prejudice. "Prejudice in this context has meant that sort of deprivation that impairs a defendant's right to a fair trial. This kind of prejudice is

commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). "[T]he proof of prejudice must be definite and not speculative," and the petitioner must demonstrate how the loss of evidence is prejudicial. *United States v. Birney*, 686 F.2d 102, 105–06 (2d Cir. 1982). "If the indictment is brought within the applicable statute of limitations, there is a presumption that the defendant was not prejudiced." *Georgison v. Donelli*, No. 04-cv-1444, 2005 WL 1384015, at *7 (S.D.N.Y. June 9, 2005), *aff'd*, 588 F.3d 145 (2d Cir. 2009).

At the outset, the Court notes that Petitioner's prosecution was brought within the statute of limitations in New York for second degree murder,[6] and, therefore, there is a presumption that Petitioner was not prejudiced by the delay. *See Symonds*, 2024 WL 4044456, at *12. Nevertheless, Petitioner's arguments concerning the degraded DNA and loss of evidence, including witness testimony, are speculative inasmuch as Petitioner fails to demonstrate how this evidence would have been material in countering evidence of Petitioner's guilt. *See United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979) (rejecting contention concerning the dimming of witnesses' memories, as this evidence "has not been considered the sort of actual substantial prejudice that predicates reversal for pre-indictment delay"); *Georgison*, 2005 WL 1384015, at *7 ("Merely asserting missing witnesses . . . is not enough to show actual prejudice."). In any event, the Due Process Clause tolerates some prejudice to the defendant. *See Lovasco*, 431 U.S. at 796; *McFadden*, 2019 WL

---

[6] *See* N.Y. CPL § 30.10(2)(a).

4016160, at *6. Accordingly, the Appellate Division did not make a finding contrary to, or unreasonably apply, clearly established Federal law in concluding that the pre-indictment delay had not prejudiced Petitioner's ability to present a defense at trial.

## II. Indelible Right to Counsel

Petitioner contends that her indelible right to counsel attached in 2005 when her attorney appeared on her behalf, and was violated in 2005 when she signed a consent form outside the presence of counsel, which allowed police to collect physical evidence, such as her clothing and earring, and again in 2017 when she waived her *Miranda* rights outside the presence of her attorney and elected to provide a statement and a DNA buccal sample. ECF No. 1 at 8, 15; ECF No. 11 at 9. Due to these alleged violations, Petitioner asserts that physical evidence and statements obtained in violation of her indelible right to counsel should have been suppressed. *Id.* at 8, 15.

The right to counsel under New York State law is more expansive than under federal law. *Figueroa v. Ricks*, 378 F. Supp. 2d 210, 225 n. 12 (W.D.N.Y. 2005); *see Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992) ("The New York Court of Appeals has consistently interpreted the right to counsel under the New York State Constitution more broadly than the Supreme Court has interpreted the federal right to counsel.").

Under New York law, "[t]he right is deemed 'indelible' because once it 'attaches,' interrogation is prohibited unless the right is waived in the presence of counsel." *Hibbert v. Poole*, 415 F. Supp 2d 225, 233 (W.D.N.Y. 2006) (quoting *People*

*v. Grice*, 100 N.Y.2d 318, 320–21 (2003)). "The right attaches once formal criminal proceedings have been commenced against an accused, but may also attach sooner if the accused requests an attorney or an attorney actually appears or communicates to police that he or she represents the accused." *Kent v. Smith*, No. 9:05-cv-0785, 2007 WL 2907350, at *4 (N.D.N.Y. Oct. 4, 2007).

Under federal law, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: it does not attach until a prosecution is commenced." *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (quoting U.S. Const. amend. VI) (footnote and additional internal quotations omitted).

The Supreme Court has "pegged commencement [of the right to counsel] to 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Rothgery*, 554 U.S. at 198 (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)); *accord Kirby v. Illinois*, 406 U.S. 682, 689 (1972). "[A]bsent the filing of a formal charging instrument, the right to counsel attaches 'at the first appearance [by the accused] before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.'" *United states v. Gumaer*, 765 F. App'x 608, 613–14 (2d Cir. 2019) (quoting *Rothgery*, 554 U.S. at 194). "[B]efore proceedings are initiated a suspect in a criminal investigation has no constitutional

19

right to the assistance of counsel." *Davis v. United States*, 512 U.S. 452, 457 (1994) (internal citation omitted); *see also United States v. Medunjanin*, 752 F.3d 576, 585 (2d Cir. 2014) ("The Supreme Court 'ha[s] never held that the right to counsel attaches at the time of arrest.'" (quoting *Gouveia*, 467 U.S. at 190)).

Here, on August 4, 2005, attorney John Ange communicated to the BPD that he had been retained to represent Petitioner in connection with the victim's homicide. AA at 160. Petitioner was subsequently interviewed by law enforcement on October 12, 2017, during which she waived her *Miranda* rights outside of Ange's presence and agreed to provide a statement and DNA buccal sample. AA 154–55; HH Tr. at 62–63, 69–72. However, prior to Petitioner's interview in October 2017, law enforcement personnel confirmed with both Petitioner and Ange that Ange no longer represented Petitioner in connection with this case. *Id.* at 43–45, 68–69.

The Appellate Division found that Petitioner's indelible right to counsel under New York State law attached in 2005 when Ange appeared in the case on her behalf, but summarily rejected the contention that her indelible right to counsel was violated when she signed a consent form turning over her clothing and earring outside of Ange's presence. *Lewis*, 199 A.D.3d at 1442–43.[7] In connection with Petitioner's waiver of counsel in 2017, the Appellate Division found that BPD properly determined that the attorney-client relationship between Ange and Petitioner had ended and, therefore, Petitioner could waive her indelible right to counsel under New

---

[7] The trial court denied Petitioner's motion to suppress her clothing and earring, finding that the officers had the right to collect this evidence in plain view notwithstanding the fact that Petitioner provided consent outside of her attorney's presence. AA 26–27.

York State law outside of Ange's presence. *Id.* at 1442. Petitioner's arguments concerning her indelible right to counsel under New York State law are not cognizable on federal habeas corpus review because the claim arises under the New York State Constitution, not federal law. *See Augustine v. Artus*, No. 914-cv-1230, 2017 WL 5891793, at *2 (N.D.N.Y. Nov. 28, 2017); *Williams*, 2014 WL 3734332, *11 n. 7; *see generally, Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state–court determinations on state–law questions.").

Under federal law, Petitioner's Sixth Amendment right to counsel had not attached at the time of alleged violations in 2005 and October 2017 since both instances were prior to initiation of adversary judicial criminal proceedings against her. *See Gumaer*, 765 F. App'x at 614 ("Because [the defendant] had not been formally charged or made his initial appearance before a judicial officer by the time of the November 29 or December 6 meetings [with law enforcement], [the defendant's] Sixth Amendment right to counsel had not yet attached"); *Williams v. Sheehan*, No. 11-cv-2435, 2014 WL 3734332, at *11 (E.D.N.Y. July 28, 2014). Because Petitioner cannot establish that her Sixth Amendment right to counsel had attached at the time of the claimed violations, she cannot show a violation of the Sixth Amendment. *See Gumaer*, 765 F. App'x at 613.

## III.  Denial of Request for *Frye* Hearing

Petitioner contends that the trial court erred in denying her request for a *Frye* hearing with regard to the admissibility of expert testimony concerning bloodstain

21

patterns. ECF 1 at 23–26. According to Petitioner, the validity of bloodstain pattern analysis has been called into question and, therefore, admitting such unreliable and speculative testimony deprived her of due process. *Id.* at 25.

Petitioner's claim that the trial court should have held a *Frye* hearing before admitting testimony regarding bloodstain pattern analysis does not provide a basis for federal habeas relief. *See Herington v. Poole*, No. 06-cv-6079, 2009 WL 4730320, at *8 (W.D.N.Y. Dec. 4, 2009) ("In general, a state court's evidentiary rulings, even if erroneous under state law, are not cognizable in a federal habeas corpus petition."); *see also Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court evidentiary rulings generally are not a basis for habeas relief."). The purpose of a *Frye* hearing is only to determine whether expert testimony and evidence has gained general acceptance in the scientific community and is therefore admissible under New York law. *Sorrentino v. LaValley*, No. 12-cv-7668, 2016 WL 3460418, at *3 (S.D.N.Y. June 21, 2016). This is a state evidentiary matter wholly separate from the question of whether the admission of such evidence violates the federal Constitution. *Id.*

For Petitioner's claim to be cognizable in this habeas proceeding, Petitioner would have to demonstrate not only that the trial court's decision to admit bloodstain pattern analysis without conducting a *Frye* hearing was erroneous, but also that this error violated an identifiable constitutional right and deprived her of a fundamentally fair trial. *Id.* (internal quotation marks omitted); *see Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("[E]ven erroneous evidentiary rulings warrant a writ of habeas

corpus only where the petitioner can show that the error deprived [him] of a fundamentally fair trial.") (internal quotation marks omitted). "In evaluating whether the trial court's possible error was so pervasive as to have denied the defendant a fundamentally fair trial, [courts] consider whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Gibson v. Bell*, No. 21–1892, 2023 WL 7320864, at *2 (2d Cir. Nov. 7, 2023) (summary order) (internal quotation marks omitted).

Even assuming, *arguendo*, that admitting the bloodstain pattern analysis testimony without conducting a *Frye* hearing was erroneous under New York evidentiary law, Petitioner was not denied a fundamentally fair trial. Viewing the record objectively as a whole, the bloodstain pattern evidence did not provide the basis for conviction or remove a reasonable doubt that would have existed on the record without it. Rather, it corroborated other evidence demonstrating Petitioner's guilt, such as Petitioner's admissions to committing the murder to multiple witnesses, lack of forced entry, use of a weapon from inside of the house, and Petitioner's missing earring found at the scene between the victim's legs.

Additionally, the bloodstain pattern expert, Craig Moore, was subject to effective cross-examination about the reliability, or lack thereof, concerning bloodstain pattern analysis. *See Gibson*, 2023 WL 7320864, at *3 (citing *Olin Corp. v. Certain Underwrites at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006)), which

discusses cross-examination as one of the ways to challenge "weak expert testimony, rather than complete exclusion."). During cross examination, Moore admitted to knowledge of a scientific report that found enormous uncertainties associated with bloodstain pattern analysis, as well as knowledge of a New York Times magazine article that was critical of bloodstain pattern analysis. Tr. at 835–36. Moore admitted that "not everyone believes that bloodstain pattern analysis is good science" and that his work in the case was not peer reviewed. *Id.* at 837–39.

Despite hearing Moore's cross-examination testimony concerning the issues of reliability with bloodstain pattern analysis, the jury weighed the totality of the evidence and still found Petitioner guilty beyond a reasonable doubt. Based on the foregoing, the Court finds that Petitioner was not deprived of a fundamentally fair trial. Accordingly, Petitioner's claim is denied.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Petitioner's habeas corpus petition is denied.


DATED:      January 22 2025
            Rochester, New York


                                    _Meredith Vacca_
                                    HON. MEREDITH A. VACCA
                                    United States District Judge

24